**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Oliver James BEASLEY, Appellee.**

Superior Court of Pennsylvania.

Argued April 12, 2000.
Filed Oct. 23, 2000.

Michael W. Streily, Asst. Dist. Atty., Pittsburgh, for Com., appellant.

Fred G. Rabner, Pittsburgh, for appellee.

Before: JOHNSON, HUDOCK, and BROSKY, JJ.

JOHNSON, J.:

¶ 1 The Commonwealth appeals from the trial court's order suppressing six kilos of cocaine police recovered from a backpack in the possession of defendant Oliver James Beasley. The Commonwealth charged Beasley with two violations of the Controlled Substance, Drug, Device and Cosmetic Act, and now certifies that the order granting suppression has effectively terminated the prosecution. *See Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382, 386 (Pa.1985). *See also* Pa. R.A.P. 311(d), 904(e). We conclude that the trial court correctly suppressed the evidence, as the police conducted a seizure of Beasley's person without reasonable suspicion of Beasley's involvement in criminal activity. Accordingly, we affirm.

¶ 2 The facts surrounding this case are set forth in the trial court opinion of the Honorable Donna Jo McDaniel, as follows:

> Off-duty Allegheny County police officer, A.J. Marx, testified that on July 27, 1998, he was in a downtown Pittsburgh restaurant with his wife and child when he observed a well-dressed, black male, whom he identified as [Beasley], seated at the restaurant bar approximately ten feet away. After about ten minutes, another male walked into the restaurant dressed a little bit shabbily and carrying a black backpack and purchase tags were still on the backpack. This individual sat down beside [Beasley] at the bar and set the backpack down between the two of them. After about five minutes of conversation, the second male stood up and said I have to check my meter to make sure I don't get tagged or towed and proceeded to leave the restaurant while leaving the backpack on the floor.
>
> The police officer could not see where the second male went after leaving the restaurant. [Beasley] waited about five minutes and then paid his bill, picked up the bag and started walking toward the door. At that point, the officer also walked toward the door and was able to reach it before [Beasley] did. The officer displayed his badge and asked [Beasley] if [he] would talk with him. [Beasley] said sure and the officer asked him to step back into the restaurant area to talk. [Beasley] started walking back and dropped the bag. The officer motioned to the bag and told [Beasley] to bring it with him. At that point, [Beasley] pushed the officer aside and ran from the restaurant leaving the bag. After five minutes, the officer opened the bag and discovered what was later determined to be cocaine.

Trial Court Opinion, 11/9/99, at 2–3. Subsequently, Beasley turned himself over to police on advice of counsel and the Commonwealth commenced this action. In his omnibus pre-trial motion, Beasley sought suppression of the contents of the backpack, contending that police discovery of the contraband was the result of an illegal seizure. The trial court agreed, reasoning that Officer Marx, upon directing Beasley to bring the backpack after the initial encounter, had conducted an investigatory detention. *Id.* at 3. The court concluded that the Commonwealth's evidence failed to establish reasonable suspicion necessary for such a detention and so ordered the evidence suppressed. *Id.*

¶ 3 On appeal, the Commonwealth raises the issue of [w]hether the trial court erred in granting suppression? Brief for Appellant at 4. Our scope of review when considering the Commonwealth's appeal of a suppression order is narrow:

[W]e must consider only the evidence of the ... [defendant's] witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. If the evidence supports the factual findings of the trial court, we are bound by such findings, and we may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Bowersox*, 450 Pa.Super. 176, 675 A.2d 718, 719–20 (1996) (citations and internal quotation marks omitted). Thus, to determine the propriety of the court's order in this case, we must discern whether the court's findings are supported by the evidence adduced at the suppression hearing and, if so, whether the court concluded correctly that Officer Marx effected an investigatory detention without reasonable suspicion. *See id.*

¶ 4 The Pennsylvania Supreme Court has been vigilant in the protection of the right to privacy guaranteed by Article I, Section 8 of our state Constitution. On repeated occasions, the Court has admonished that:

The seriousness of criminal activity under investigation, whether it is the sale of drugs or the commission of a violent crime, can never be used as justification for ignoring or abandoning the constitutional right of every individual in this Commonwealth to be free from intrusions upon his or her personal liberty absent probable cause.

*Commonwealth v. Polo*, —— Pa. ——, ——, 759 A.2d 372, 376 (2000) (quoting *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 775–76 (1996)). To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive. Our Supreme Court has defined three forms of police-citizen interaction: a mere encounter, an investigative detention, and a custodial detention. *See Commonwealth v. Boswell*, 554 Pa. 275, 721 A.2d 336, 340 (1998). A mere encounter between police and a citizen need not be supported by any level of suspicion, and carr[ies] no official compulsion on the part of the citizen to stop or to respond. *Commonwealth v. Riley*, 715 A.2d 1131, 1134 (Pa.Super.1998), *appeal denied*, 558 Pa. 617, 737 A.2d 741 (1999). No constitutional provision prohibits police officers from approaching a citizen in public to make inquiries of them. *Boswell*, 721 A.2d at 339–40. However, [i]f the police action becomes too intrusive, a mere encounter may escalate into an investigatory [detention] or seizure. *Id.* To determine whether a mere encounter has risen to the level of an investigatory detention, we must discern whether, as a matter of law, police have conducted a seizure of the person involved. *See Commonwealth v. Mendenhall*, 552 Pa. 484, 715 A.2d 1117, 1119 (1998).

To decide whether a seizure has occurred, we apply the following objective test: a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. In applying this test, it is necessary to examine the nature of the encounter. Circumstances to consider include, but are not limited to, the following: the number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a

member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Boswell*, 721 A.2d at 340 (internal citations, quotation marks and brackets omitted). *See also Polo*, —— Pa. at ——, 759 A.2d at 379 (Saylor, J., concurring and dissenting). Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes. *See Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 773 (1996) (quoting *Commonwealth v. Jones*, 474 Pa. 364, 378 A.2d 835, 840 (1977)).

¶ 5 In this case, all parties agree that the incident between Officer Marx and Beasley began as a mere encounter. The trial court concluded, however, that the encounter escalated into an investigatory detention, and hence a seizure, when, after agreeing to speak with Marx, Beasley dropped the backpack and Marx told him to bring the bag with him while they talked. Trial Court Opinion, 11/9/99, at 3. The Commonwealth argues that no seizure occurred because the circumstances surrounding Marx's approach to Beasley were non-coercive. Specifically, the Commonwealth points out that Marx was neither armed nor in uniform, and that Marx spoke in a normal tone of voice without issuing commands.

■■■ ¶ 6 The Commonwealth's assertions notwithstanding, we conclude that the totality of the circumstances was sufficiently coercive that a reasonable [person] innocent of any crime, would have thought he was being restrained, *Matos*, 672 A.2d at 773, and hence, would not have felt free to terminate the encounter. Initially, Officer Marx displayed his badge and identified himself as a police officer. N.T. Suppression Hearing, 8/30/99, at 9. Marx then positioned himself immediately adjacent to Beasley, physically between Beasley and the exit to the restaurant. *Id.* at 28–29. When Beasley dropped the backpack to

the floor of the restaurant, Marx told him to bring the backpack with him. *Id.* at 10. Such a directive, issued after Marx's display of his badge, was clearly a command issued under color of official authority. Moreover, Marx's evident interest in the backpack clearly suggests suspicion regarding its contents and Beasley's relationship to those contents. Because Marx's command both exercised official authority and implied Beasley's participation in illegal activity, it caused the encounter to escalate to an investigatory detention. At that point in time, Beasley was legally seized. *See Commonwealth v. Martin*, 705 A.2d 887, 891 (Pa.Super.1997) (concluding that mere encounter with plain-clothes officer escalated to an investigatory detention when officers in uniform approached defendant and told him they had received a tip that he was selling drugs); *Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d 619, 623 (1994) (concluding that seizure occurred where plain-clothes officers met defendant at bus station, told him they were working narcotics and doing an interdiction program checking for couriers bringing drugs back from New York, and questioned him about his trip).

■■■ ¶ 7 Our courts have mandated that law enforcement officers, prior to subjecting a citizen to investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. *See Commonwealth v. Allen*, 452 Pa.Super. 200, 681 A.2d 778, 783 (1996). *See also Polo*, —— Pa. at ——, 759 A.2d at 375 (reaffirming rule of law that an 'investigative detention' must be supported by reasonable suspicion). [T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity. *In re D.M.*, 556 Pa. 160, 727 A.2d 556, 557 (1999). Thus, to establish grounds for reasonable suspicion, the officer whose im-

pressions formed the basis for the stop must articulate specific facts which, in conjunction with reasonable inferences derived from those facts, led him reasonably to conclude, in light of his experience, that criminal activity was afoot. *See Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 677 (1999). Although the police officer's own observations, knowledge and experience thus weigh heavily in determining whether reasonable suspicion existed, our courts remain mindful that the officer's judgment is necessarily colored by [his or her] primary involvement in 'the often competitive enterprise of ferreting out crime.' *In re D.E.M.*, 727 A.2d 570, 578 n. 19 (Pa.Super.1999) (quoting *Terry v. Ohio*, 392 U.S. 1, 11–12, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Therefore, the test we apply remains an objective one and will not be satisfied by an officer's hunch or unparticularized suspicion. *Commonwealth v. Arch*, 439 Pa.Super. 606, 654 A.2d 1141, 1144 (1995).

■ ¶ 8 Although an officer may consider the modes or patterns of operation of certain kinds of lawbreakers, *Commonwealth v. Fink*, 700 A.2d 447, 449 (Pa.Super.1997), our courts have held, repeatedly, that such profiles do not substitute for independent observation of an individual's behavior, *see Lewis*, 535 Pa. at 510–12, 636 A.2d at 624 (1994); *Commonwealth v. Jackson*, 428 Pa.Super. 246, 630 A.2d 1231, 1234 (1993) (holding that in the absence of a firmly established successful drug courier profile, [a] mere showing of innocent behavior is insufficient to establish reasonable suspicion). Accordingly, an officer's belief that criminal activity is afoot, albeit plausible under the circumstances, must be linked with his observation of suspicious or irregular behavior of the particular defendant stopped before he may conduct the stop. *Commonwealth v. Wilson*, 440 Pa.Super. 269, 655 A.2d 557, 561 (1995); *Commonwealth v. Wright*, 448 Pa.Super. 621, 672 A.2d 826, 826 (1996); *Commonwealth v. Tither*, 448 Pa.Super. 436, 671

A.2d 1156, 1158 (1996); *Arch*, 654 A.2d at 1144. Consequently, we have held, on multiple occasions, that even where the circumstances surrounding an individual's conduct suggest ongoing illegality, the individual may not be detained unless his or her personal conduct substantiates involvement in that activity. *See Tither*, 671 A.2d at 1158 (concluding that defendant's conduct failed to establish reasonable suspicion where police witnessed defendant in parked car, saw second person reach inside car, and saw both parties depart when third person yelled a warning exposing police presence; police saw no exchange of money or drugs and had no prior information of criminal activity); *Wilson*, 655 A.2d at 560 (concluding that defendant's conduct failed to establish reasonable suspicion where defendant twice exited his vehicle in neighborhood of high drug activity and disappeared from sight prior to returning to his vehicle; although police did observe drug activity involving others in the neighborhood, they did not see defendant engage in exchange of objects or money); *Commonwealth v. Martinez*, 403 Pa.Super. 125, 588 A.2d 513, 516 (1991) (concluding that defendant's conduct failed to establish reasonable suspicion where, upon approach of police, defendant departed company of several others with whom she appeared to be talking and hurried away displaying a bulge in the front of her jacket; police did not observe interaction amongst group other than apparent conversation).

■ ¶ 9 We conclude that the circumstances observed by Officer Marx fail to substantiate either a reasonable suspicion of criminal activity or Beasley's participation in such activity. As in *Tither, Wilson*, and *Martinez*, the conduct in which Beasley engaged, even considered in light of the totality of the circumstances from the perspective of a trained police officer, does not suggest Beasley's involvement in criminal activity. Indeed, Beasley's conduct appears largely innocuous and substantiates no conclusion by Officer Marx beyond a hunch. *See Arch*, 654 A.2d at

1144. Marx's own testimony reveals the paucity of the circumstances on which he relied to conduct the stop:

Q. Why did you approach [Beasley] in the first place, Detective?

A. Well, a couple of things drew my attention. One was that [Beasley] was well dressed, well groomed, and the second suspect, he was dressed shabbily and carrying a backpack which still had the tags on it, carrying it in his left hand and you can tell by the way the strap was pulled on the bag.

The fact that those things—then he sits back down between them. He's there five minutes and says, I have to check the meter. I know the meters in the area are out front and you should be able to go in and out in less than one minute, and he didn't come back in. [Beasley] picked [the backpack] up and started to walk out the door, it looked like a regular drop to me.

N.T. Suppression Hearing, 8/30/99, at 11–12.

¶ 10 Initially, we find little value in Officer Marx's opinion that the transaction looked like a regular drop. *Id.* Such a conclusion provides no objective basis upon which the trial court or this Court can gauge the nature of Beasley's conduct preceding the stop. *See In re D.M.*, 727 A.2d at 557 (requiring a particularized and objective basis for suspecting the individual stopped of criminal activity). Accordingly, we are compelled to disregard Officer Marx's statement of opinion. Upon review of Marx's objective observations coupled with reasonable inferences, *see Cook*, 735 A.2d at 677, we find scant basis on which to premise reasonable suspicion.

¶ 11 Initially, the manner of Beasley's dress or that of his companion, upon which Officer Marx relied to ground a conclusion of reasonable suspicion, *id.* at 11, bears no relationship whatever to the two men's involvement in unlawful activity. In point of fact, a suggestion that the disparate grooming characteristics of any two individuals in some way impact the legality of their conduct can be rooted only in preconceived notions of social propriety, properly irrelevant to law enforcement.

¶ 12 Similarly, the departure of Beasley's companion for his parking meter and the manner in which he apprised Beasley of his intentions have little probative value in determining Beasley's participation in criminal activity. Officer Marx stated that Beasley's companion spoke loudly on departing and left his backpack, which Beasley some minutes later retrieved before attempting his own departure. The record suggests that Marx attributed the tone of the man's voice to a desire to disguise his real intentions. However, we find no probative value in Marx's observation, as the record shows that Marx had heard the man speak only once previously, when he had ordered a drink from the bartender. N.T. Suppression Hearing, 8/30/99, at 22–23. Clearly, Marx had no adequate basis upon which to discern the speaker's normal tone of voice. In addition, although the record reflects that the man was seated at the bar when he spoke to the bartender, it provides no measure of his distance from Beasley, whom he was addressing, when he stated his intention to leave. Ostensibly, the man spoke loudly merely to be heard by his listener as he walked away. Accordingly, we find no objective indication in the record upon which to infer why the man raised his voice, if in fact he did, leaving us with no substantiation for Marx's inference concerning the man's motive or Beasley's participation in criminal activity when he picked up the man's backpack.

¶ 13 Marx's further reliance on the location of parking meters abutting the sidewalk outside the restaurant as a basis to suspect the pair's activities is similarly flawed. Marx's suspicion that Beasley's companion had conducted a drug drop because he did not return after the brief span of five minutes, reflects a supposition

that the man could only have parked in front of the restaurant or very near by. However, the record reflects that he may have parked in any space along the street for several blocks. *Id.* at 22. Marx articulated no knowledge of where the man parked and, consequently, could only speculate on the amount of time he would likely take to return, or his motive for not returning within five minutes.

¶ 14 Finally, concerning the appearance and contents of the backpack, we find no reliable indication of criminal activity either in its apparent weight or in the presence of sales tags. Officer Marx failed to articulate, at any time, why the presence of sales tags on the bag suggested that either its owner or Beasley were involved in criminal activity. Concerning the purported weight of the pack, any number of weighty objects may have caused the pulling of the pack's strap that Officer Marx observed. Moreover, Marx could not state any characteristic of the backpack, including its shape, that suggested its contents were, in fact, contraband. *Id.* at 24–25.

¶ 15 Although we recognize that our courts must review the totality of the circumstances in view of the detaining officer's expertise in law enforcement, *see Fink*, 700 A.2d at 449, we must conclude that the circumstances at issue substantiate nothing more than a hunch, *see Arch*, 654 A.2d at 1144. We do not find sufficient irregularity in Beasley's conduct or the related occurrences observed by Officer Marx to establish a particularized and objective basis to suspect Beasley's involvement in criminal activity at the time and place of the stop. *In re D.M.*, 727 A.2d at 557. We conclude, accordingly, that the trial court did not err in concluding that Beasley was subjected to detention without reasonable suspicion.

¶ 16 For the foregoing reasons, we conclude that the court properly ordered the evidence of contraband suppressed as the product of an illegal search. *See Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Commonwealth v. Mesa*, 453 Pa.Super. 147, 683 A.2d 643, 649 (1996).

¶ 17 Order **AFFIRMED**.

¶ 18 HUDOCK, J. files a Dissenting Statement.

HUDOCK, J., dissenting.

¶ 1 I agree with my learned colleagues that the incident between Officer Marx and Appellant began as a mere encounter when the officer followed Appellant to the door and asked to speak with him after displaying his badge. The Appellant agreed to step back into the restaurant area to speak with the officer, and it was at this point—while the transaction was still a mere encounter—that Appellant dropped the backpack on the floor of this public restaurant, thereby abandoning the backpack under non-coercive circumstances. Appellant's intent to abandon the property is rather clear from subsequent events, when he shoved the officer and ran out the door, after the officer directed him to retake possession of the backpack. I would not find the seizure of this abandoned contraband to be unconstitutional.

¶ 2 Further, even if there was no abandonment at this point, I believe the totality of circumstances warrant the seizure. I further agree with my learned colleagues that when the officer directed Appellant to bring the bag or backpack with him, this assertion of authority changed the mere encounter to an investigatory detention. However, unlike the majority, I find that the circumstances observed by Officer Marx do rise to the level of a reasonable suspicion of criminal activity justifying the investigative detention. To a lay person, the interaction between Appellant and the courier who delivered the backpack may have simply appeared to be strange behavior; to the eye of this trained law enforcement officer, who had twenty-seven years of police experience, and twenty years narcotics investigatory experience, it appeared

to be exactly what it was: a regular drop of drugs.

¶ 3 Accordingly, I dissent.