**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SYLVESTER ANDERSON | : | No. 662 MDA 2020 |

Appeal from the Suppression Order Entered April 21, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004013-2019

BEFORE:  MURRAY, J., McLAUGHLIN, J., and McCAFFERY, J.

DISSENTING MEMORANDUM BY McCAFFERY, J.:  **FILED MARCH 30, 2021**

"The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."[1]

This Court takes the unusual step of reversing a trial court's suppression determination, and in doing so, purports to establish the propriety of an invasive search as "reasonable" in the context of what it characterizes as a mere encounter.[2]  Though the Majority gestures toward deference to the trial

---

[1] **Wolf v. Colorado**, 338 U.S. 25, 27 (1949), *overruled on other grounds*, **Mapp v. Ohio**, 367 U.S. 643 (1961) (overruling **Wolf**'s holding that the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure in state prosecutions).

[2] Our Supreme Court has outlined three tiers of police-citizen interaction: a mere encounter, an investigatory detention, and a custodial detention.  **See**

court's role as finder of fact, and to confining its *de novo* review to legal conclusions, it is not so clear that the scope of permission to search purportedly given here is a purely legal determination. The Majority, in my view, strays further than is necessary to reach its desired conclusion, and in doing so introduces the notion, unsupported by any citation, that "any reasonable person" who is asked whether they have anything illegal on their person and is then subjected to a search must **reasonably anticipate** that the search will extend "to any reasonable place on the 'person' where a person could secrete contraband, such as the groin." Majority Memo. at 11.[3] I do not believe a person's genitalia constitute a "reasonable place" for such a public search simply because a person "could secrete contraband" there. Further, under the Majority's analysis, a cavity search is not off-limits because grabbing at genitalia is "reasonable." In my view, the trial court's opinion reflects deep consideration of the law and the facts, and I would affirm.

---

***Commonwealth v. Boswell***, 721 A.2d 336, 340 (Pa. 1998). A mere encounter between the police and a citizen during which an officer simply questions the citizen without suggestion of coercion, carries no official compulsion on the part of the citizen to stop or to respond and need not be supported by any level of suspicion. ***See Commonwealth v. Beasley***, 761 A.2d 621, 624 (Pa. Super. 2000). If, however, the police presence becomes too intrusive, a mere encounter will become an investigatory detention or seizure. ***See id.***

[3] Although the Majority repeats the word "reasonable" in its novel enunciation of the search by consent exception, merely doing so does not render that enunciation constitutional, or reasonable, for that matter.

Further, the Majority's analysis, to the extent it is not strictly necessitated by its desired end of reversal, must be considered *dicta*, but nevertheless it is dangerous *dicta*, and because I fear the consequences of this sweeping declaration, I must respectfully dissent.

When reviewing the grant of a suppression motion,

> we must determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn from those facts are correct. We may only consider evidence presented at the suppression hearing. In addition, because the defendant prevailed on this issue before the suppression court, we consider only the defendant's evidence and so much of the Commonwealth's evidence as remains uncontradicted when read in the context of the record as a whole. **We may reverse only if the legal conclusions drawn from the facts are in error.**

*Commonwealth v. Haines*, 168 A.3d 231, 234 (Pa. Super. 2017) (citations omitted; emphasis added). "The issue of whether consent has been voluntarily given is a **question of fact** which must be determined in each case from the totality of the circumstances." *Commonwealth v. Watkins*, 344 A.2d 678, 679 (Pa. Super. 1975) (citation omitted; emphasis added).

The trial court made a thorough analysis of the scope of the search, noting that if it exceeded the bounds of the permission given, it is impermissible, and that the Commonwealth bore the burden of establishing that the search Officer McGowan conducted was within the scope of the consent Appellant gave. Trial Ct. Op., 4/21/20, at 3-4. The trial court noted a paucity of Pennsylvania law on the subject, and then looked to federal law, which is reasonable given that the rights provided under our state and federal

constitutions in this regard are coextensive. The trial court then described the circumstances of **U.S. v. Blake**, 888 F.2d 795 (11th Cir. 1989). In **Blake**, subjects "encountered" at an airport by plainclothes officers consented to a patdown; however, the **Blake** Court concluded that this grant of consent could not "be construed as authorization for one of the officers to touch their genitals in the middle of a public area in the . . . [a]irport." **Id.** at 800; Trial Ct. Op. at 4. The circumstances of **Blake** are markedly similar to those at hand in this matter. The **Blake** Court did not say that all such intrusive patdowns are off-limits, but rather that where such intrusive searches are to be conducted, officers must "obtain proper consent." **Id.** The evidence (which we must view in the light most favorable to Appellant) shows no warning from the investigating officers that the scope of the search would include the genital area. I can find no fault in the trial court's analysis, and certainly I cannot see how this analysis, even given all appropriate deference, requires reversal. In my view, much of the trial court's analysis flows directly from its experience as factfinder and its thorough and immediate sense of the facts (a sense that we cannot duplicate, and therefore should not second-guess, on appeal).

The Majority's purported roadmap for charting a constitutional path toward reversal is far too vague for such an important type of interaction between police and citizen. Thousands of police officers rely on instruction from the courts, and especially this Court (as the appellate court of right in most search and seizure matters in Pennsylvania), to guide their interactions

with private citizens.[4] Those citizens are at the absolute heart of this inquiry — what can they reasonably expect when a uniformed peace officer asks to search them in a public place? Is it akin to a frisk upon entering a government building? Or perhaps like a patdown at airport security? When citizens are "reasonably" subject to the searching hands of an armed officer of the state, our analysis of what is reasonable must also be more searching than "I know it when I see it."[5] In my view, to curtail the search and seizure rights of private persons and expand police power without any supporting citation from a higher authority is impermissible for a panel of this Court.[6]

I also must express reservations as to the way the facts, as outlined by the Majority and the trial court, fail to support the escalation of this encounter. The first indication that the investigating officers have any hint of potential criminal activity comes when, as Officer McGowan testified, his observation of a bad parking job led him to wonder whether "the individual was possibly, you

---

[4] *See* N.T. Suppression, 1/23/20, at 24 (Officer McGowan: "I mean, we're constantly going over PA Supreme Court case law, PA Superior Court case law . . . we talk about case law . . . .").

[5] *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[6] *See Matter of M.P.*, 204 A.3d 976, 986 (Pa. Super. 2019) ("Superior Court is an error correcting court and we are obliged to apply the decisional law as determined by the Supreme Court . . . [i]t is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines.") (citations omitted).

know, intoxicated or impaired on alcohol or a controlled substance." Trial Ct. Op. at 3. Yet as the trial court points out, none of the investigating officers took steps to discover whether Sylvester Anderson had even driven the ill-parked vehicle. *Id.*[7]

For the same reason, I must note my disagreement with footnote one on page nine of the Majority's analysis, in which the Majority asserts that **even if** this was an investigative detention (which it was), it was supported by reasonable suspicion of driving under the influence. Sweating in late May is evidence neither of being under the influence nor of driving. Further, the fact that Anderson initially walked away from the cluster of officers, under most circumstances, conclusively demonstrates that the subject was not driving.[8] The factfinder, by contrast, notes that when Officer McGowan first observed the vehicle, it was "not running, [the Officer] did not see anyone operating the truck and did not observe how the truck got into the parking lot." Trial Ct. Op. at 2. "Further, there was no indication that [Anderson] was the operator of the truck except for [his momentary proximity thereto]." *Id.* There is no evidence that officers felt the truck's hood to see if it was warm.

_____

[7] Officer McGowan confirmed that when he first saw Anderson, he was already on the ground. N.T. Suppression, 1/23/20, at 8.

[8] *See* Trial Ct. Op., 4/21/20, at 2 ("When [Appellant] exited Harrisburg Fried Chicken, he noticed the officers were still present in the parking lot, and then 'began to walk the opposite direction' away from the officers and the Dodge truck.").

"Despite [Officer McGowan's disapproval of the way the truck was parked and concerns that its driver may have been under the influence], Officer McGowan testified that he did not intend to find the driver of the vehicle or ask [Anderson] if he was the operator of the vehicle." *Id.* We must show appropriate deference to **all** of the trial court's factfinding; in my opinion, doing so in this case leads inexorably to the conclusion that Officer McGowan's credible testimony that he did not intend to locate the driver of the truck eliminates this potential alternative source of support for the search.

The trial court noted our Supreme Court's opinion in *Commonwealth v. Cost*, 224 A.3d 641, 651 (Pa. 2020), holding that "the retention by police of an identification card to conduct a warrant check will generally be a material and substantially escalating factor within the totality assessment" of whether what began as a mere encounter has become something more coercive. *See* Trial Ct. Op. at 9. Where the Majority purports to predicate its reversal on the trial court's findings of fact, it ought to acknowledge this crucial indication that the factfinder itself has re-evaluated its finding of non-coerced consent in light of *Cost*, a key opinion that the Majority does not square with its analysis.

Findings of fact must be arrived at within a frame of applicable law. *Cost* informs the fact-finder's evaluation of the subject interaction after Anderson was asked to, and did, relinquish his identification — as it must. The trial court notes the substantial similarity between the *Cost* scenario and the facts at issue here. Trial Ct. Op. at 10. Trial courts should be supported when

they are acting as factfinders and incorporate developments in case law into their framing of the facts, especially where they may have to re-evaluate a finding or conclusion in the new light provided by those developments.

The Majority cites *Commonwealth v. Au*, 42 A.3d 1002, 1007 (Pa. 2012) ("a request for identification is not to be regarded as escalatory in terms of the coercive aspects of a police-citizen encounter"), but *Au* must be viewed in light of *Cost*, which acknowledges retention of identification to be a "material and substantial escalating factor" in the totalities analysis. The trial court, in my view correctly, concludes that under *Cost*, the fact that Anderson had been approached by five uniformed officers who asked for, and then retained, his ID card, supports a conclusion that the encounter had already escalated at that point to an investigatory detention. Trial Ct. Op. at 9.

The very precision of Officer McGowan's testimony, credited by the trial court and implicitly relied upon by the Majority, betrays that the patdown must have been more invasive than the brisk, back-of-the-hand passes to which we are subjected in the name of safe air travel and prevention of terrorism. Officer McGowan testified that Anderson walked away from the officers congregated outside the chicken restaurant, but they pursued him — this is surely a factor that must figure into any analysis of the encounter. *See* N.T. Suppression, 1/23/20, at 6. Surely Officer McGowan would have to be clairvoyant to determine, from a patdown, that what he was feeling through the layered fly area of Anderson's pants was almost exactly an ounce of a

substance that could only be crack cocaine. As it happens, Officer McGowan was right. However, to have formed that kind of certainty about the mass he correctly identified as an approximately one-ounce quantity of crack, he must have been grabbing at the area – otherwise, there would be no way for him to know the size, texture, and approximate mass of the suspected contraband. For the very reasons his testimony is credible, it also raises the uncomfortable and unavoidable prospect that the Majority is throwing open the doors for a far more invasive police-citizen encounter than most "reasonable" individuals have ever contemplated.

Finally, I am uncomfortable with the Majority's memorandum in this case because nowhere does it demonstrate contemplation of a crucial question: how would you feel if it happened to you, or to someone you love, right in front of you? How would you feel if police were grabbing at private zones of your body? Would you think "well, this is reasonable" or would your capacity for such reasoned thought be impinged by feelings of fear, humiliation, and shame? Why is there no recognition, let alone weighing, of this aspect of what happened here? It is humiliating to have one's genital area grabbed in a public area, and all the more so when one is expected (indeed, forced) to submit to such probing. Even if the Majority correctly asserts that reasonable persons will understand their consent to a **_Terry_** patdown to include a tactile exploration of their genital area, some

acknowledgment of the anguish this treatment may cause would strengthen the analysis.

If this Court views the trial court's determinations of fact with sufficient deference, it must conclude that the trial court's conclusion that this search far exceeded the scope of anything to which Anderson consented is correct. Further, the trial court is right to reevaluate the voluntariness of consent here in light of *Cost*; without vacillating in its factual findings, the trial court acknowledges that the facts in the present matter are markedly similar to those in *Cost*.[9]   Trial Ct. Op. at 10-11.   Thus, it is impossible for me to understand how this Court could be demonstrating sufficient deference both to *Cost* as controlling precedent and to the factfinder's domain, given that the Majority does not cite *Cost* and fails to address the trial court's recognition that the fact pattern is so similar to the matter at hand.   This compelling analysis, far from representing an abuse of discretion, strikes me as entirely reasonable and worthy of being upheld in the present appeal.

When viewed in the light most favorable to the prevailing party, Anderson, I must conclude that the record supports the suppression court's findings.  I also believe the opinions filed by the trial court reflect an awareness

---

[9] I also note that the trial court docket reflects that on June 19, 2020, the trial court received and docketed a request from Anderson for appointment of counsel.  The docket does not reflect that counsel has been appointed, and no brief has been filed on Anderson's behalf.  Thus, it may be appropriate to remand to the trial court for a determination of whether Anderson qualifies for appointed counsel to protect his rights in the present appeal.

of and application of relevant precedent without error. The Majority claims to have identified an error, but does not point to a single case or rule that the trial court erroneously failed to apply or misapplied. Therefore, in my view, we are bound to affirm the trial court's decision to suppress the fruits of this encounter.

On all the bases outlined *supra*, I respectfully dissent.