J-S14006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL SINCLAIR | : | |
| | : | |
| Appellant | : | No. 1072 EDA 2024 |

Appeal from the Judgment of Sentence Entered April 10, 2024
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0000025-2021

BEFORE: DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:           **FILED MAY 14, 2025**

Appellant, Michael Sinclair, appeals from the April 10, 2024 judgment of sentence entered in the Delaware County Court of Common Pleas following his conviction after a stipulated bench trial of Possession with Intent to Deliver, Conspiracy to Commit Possession with Intent to Deliver, Person not to Possess a Firearm, and Firearms not to be Carried without a License.[1] Appellant challenges the denial of his pretrial suppression motion claiming that police lacked probable cause to stop him and then illegally extended the traffic stop. After careful review, we affirm.

The relevant facts and procedural history are as follows. On October 7, 2020, Pennsylvania State Police ("PSP") Troopers Cody Simcox and Brian

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), and 18 Pa.C.S. §§ 903, 6105(a)(1), and 6106(a)(1), respectively.

Tierney were patrolling Interstate 95 in a patrol vehicle driven by Trooper Simcox and equipped with an MVR recording device.[2] The troopers observed a silver Kia sedan with a Texas license plate operated by a man later identified as Appellant traveling southbound. After "pacing" Appellant's vehicle with their own vehicle's calibrated and certified speedometer at a constant speed of 65 MPH in a 55 MPH-zone and observing Appellant's vehicle cross over the lane designators at least once on both the right and left sides, the troopers initiated a traffic stop.[3]

Appellant responded by pulling his vehicle onto the shoulder. Trooper Tierney then exited the patrol vehicle, approached Appellant's vehicle, and noticed a male passenger in the front passenger seat. Trooper Tierney requested Appellant's identification, and Appellant eventually produced it. Meanwhile Trooper Tierney noticed "a lot of abnormalities," such as Appellant taking a large bite of food as soon as Trooper Tierney approached, "to the point where [Trooper Tierney] couldn't really understand [Appellant]. N.T. Suppression, 5/26/22, at 14. Appellant appeared to be nervous and avoided making eye contact with Trooper Tierney. Appellant's passenger also avoided

_____

[2] The MVR device was in working order at the time of the troopers' interaction with Appellant.

[3] In his role as driver of the vehicle, Trooper Simcox was responsible for safely operating the vehicle and making sure the vehicle maintained a consistent distance behind Appellant's vehicle. As passenger, Trooper Tierney was responsible for the speedometer.

looking at Trooper Tierney at all, sitting almost sideways in his seat facing the side window, while seeming nervous and restlessly bouncing his leg.

Officer Tierney also observed that Appellant's vehicle, which Troopers Tierney and Simcox determined was a rental, was full of trash and personal belongings and a "bunch" of air fresheners hung from the rearview mirror, which Trooper Tierney thought was unusual in a rental car. *Id.* at 15.

Trooper Tierney asked Appellant to provide him with the rental agreement for the vehicle, but the documents Appellant provided were blank. This, in addition to Trooper Tierney's observations of the demeanors of Appellant and his passenger, and the condition of the vehicle, prompted Trooper Tierney to decide to question Appellant further. However, there was heavy traffic and elevated road noise, and Trooper Tierney was very close to the road, so for his own safety and to "get the things that I needed to communicate with him effectively[,]" Trooper Tierney asked Appellant to exit his vehicle and stand between the back of Appellant's car and the front of the patrol vehicle. *Id.* at 16.

Shortly after exiting his vehicle, Appellant showed Trooper Tierney an electronic version of the vehicle rental agreement on Appellant's phone, which indicated that the rental agreement was in Appellant's name and that Appellant had recently rented the vehicle. Trooper Tierney's experience and "the things [he] observed on the traffic stop prompted him to believe that there could be something additional going on." *Id.* at 17. He, therefore, asked Appellant about his travel plans and his passenger. Trooper Tierney

thought it was unusual that Appellant claimed to have known his passenger for four or five months but was unable to tell Trooper Tierney the passenger's name, where the passenger lived, or where Appellant had picked up the passenger. To Trooper Tierney this was "indicative of, a lot of times, of what I would consider a criminal voyage, that they're - - that it's a red flag so that there may be something going on." *Id.* With respect to their travel plans, Appellant told Trooper Tierney that he and his passenger were on their way to a State store in Delaware and the passenger indicated that they had only been together for a brief period.

Trooper Tierney then spoke briefly with the passenger, before explaining to Appellant that "there were a lot of things that I saw as a police officer that led me to believe that there was criminal activity going on" and asking Appellant for, and ultimately receiving, consent to search the vehicle. *Id.* at 20. Appellant and Trooper Tierney "spoke at length" and ultimately Appellant consented to the search. *Id.* Trooper Tierney did not terminate the initial traffic stop by informing Appellant that the traffic stop had ended, and that Appellant was free to go before requesting permission to search.

Troopers Tierney and Simcox proceeded to search Appellant's vehicle and located a salt container on the ground of the rear of the vehicle containing numerous bundles of heroin; they also found other packaged bundles of heroin under the driver's seat area. Following this discovery, the troopers handcuffed Appellant and his passenger and placed them under arrest. PSP then towed the vehicle to the local barracks, obtained a search warrant, and recovered

additional drugs and a firearm. The Commonwealth charged him with the above crimes.

Appellant filed a motion to suppress asserting generally that "[a]ll physical evidence found was the result of an illegal search by a police officer without the required search warrant or any exigent circumstances justifying the failure to have a search warrant." Motion, 9/9/21, at ¶ 4, 6.

The trial court held a hearing on the suppression motion on May 26, 2022, at which Trooper Tierney testified consistently with the above facts. The Commonwealth also played for the court the MVR recording of the interaction with Appellant, which showed Appellant, *inter alia*, crossing and straddling the lines demarcating the lanes of traffic. Trooper Tierney, in recorded contemporaneous narration, can be heard indicating that Appellant was "swerving all over the place." N.T. Suppression at 25.

On cross-examination, Trooper Tierney testified that he stopped Appellant for multiple violations of the Motor Vehicle Code. He testified that Appellant provided him with the rental agreement for the vehicle and his identification within two minutes of stopping Appellant. He then testified that, because he observed indicia of criminal activity and "reasonable suspicion ha[d] been building up since the moment I walked up to his vehicle," even though Appellant had provided the requested documentation, Trooper Tierney "was planning on continuing the line of questioning" regarding his travel plans. *Id.* at 45.

With respect to Appellant's swerving, Trooper Tierney testified that "furtive motions" can "play into [Appellant's] motor vehicle violation"— sometimes "the reason for [a] traffic violation in the first place is an indicator that [a driver] is worried about a presence behind his vehicle." *Id.* Trooper Tierney testified that within five minutes of the traffic stop, had it not been for the indicia of criminal activity, he could have given Appellant a ticket and let Appellant leave, but because of the indicators he continued his investigation.

The MVR recording, played again during cross-examination, showed Appellant, more than 12 minutes after the traffic stop began, repeatedly asking Trooper Tierney "where's my ticket?" *Id.* at 54. The video also showed Trooper Tierney tell Appellant that he "absolutely does not have to let me search his vehicle, that he has the right to say no." *Id.* at 55. Trooper Tierney testified that he informed Appellant that if Appellant did not give consent, he would call the search canine.

On October 31, 2022, the suppression court denied Appellant's motion to suppress. On February 2, 2024, following a stipulated bench trial, the trial court convicted Appellant of the above charges. On April 10, 2024, the trial court sentenced Appellant to an aggregate term of 4 to 8 years of incarceration followed by 4 years of probation.

This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following two issues for our review:

1. Whether the stop of [Appellant's] vehicle by police was undertaken in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article 1 Section 8 of the Pennsylvania Constitution and applicable provisions of the Pennsylvania Vehicle Code, in that the stop was not based on probable cause, reasonable suspicion[,] or any other lawful justification whatsoever, where the record fails to show the exact speed at which [Appellant's] vehicle was travelling, or the extent to which [Appellant's] vehicle crossed lane dividers?

2. Whether the warrantless search of [Appellant's] vehicle, which revealed unlawful drugs, was undertaken in violation of [Appellant's] right against unreasonable searches and seizures, granted by the Fourth and Fourteenth Amendments to the United States Constitution and Article 1 Section 8 of the Pennsylvania Constitution, in that police prolonged the traffic stop by asking questions of [Appellant] not related to the alleged Vehicle Code violation, where the information gathered did not justify continued detention of [Appellant], and police thereby extended the stop of [Appellant's] vehicle beyond the time necessary to complete tasks tied to the traffic infraction and related safety concerns, amounting to the continued detention of [Appellant] not based on reasonable and articulable suspicion that [Appellant] was involved in criminal activity separate from the traffic violation, and [Appellant's] consent to search the vehicle was the direct result of the said unlawful detention?

Appellant's Brief at 4-5.

We review the trial court's decision to deny a motion to suppress to determine "whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." **Commonwealth v. Freeman**, 150 A.3d 32, 34 (Pa. Super. 2016) (citation omitted). "Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when

read in the context of the record as a whole." *Id.* (citation omitted). "Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial." *Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017).

We are highly deferential to the suppression court's factual findings and credibility determinations. *See Commonwealth v. Batista*, 219 A.3d 1199, 1206 (Pa. Super. 2019). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. 2003) (internal citation omitted). "[I]f the record supports the suppression court's findings, we may not substitute our own findings." *Bastista*, 219 A.3d at 1206 (citation omitted). However, we "give no deference to the suppression court's legal conclusions" and review them *de novo*. *Id.* (citation omitted).

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of our state Constitution "protect citizens from unreasonable searches and seizures." *In re D.M.*, 781 A.2d 1161, 1163 (Pa. 2001). "To secure the right of citizens to be free from [unreasonable searches and seizures], courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive." *Commonwealth v. Beasley*, 761 A.2d 621, 624 (Pa. Super. 2000).

Our Supreme Court has defined three levels of interaction between citizens and police officers: (1) mere encounter, (2) investigative detention, and (3) custodial detention:

> The first of these is a 'mere encounter' (or request for information) which need not be supported by any level of suspicion but carries no official compulsion to stop or to respond. The second, an 'investigative detention' must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or 'custodial detention' must be supported by probable cause.

*Commonwealth v. Ranson*, 103 A.3d 73, 76-77 (Pa. Super. 2014) (citation omitted).

A traffic stop is a special kind of seizure, which a police officer may only initiate if he has reason to believe that a violation of the traffic code has occurred. *Commonwealth v. Brown*, 64 A.3d 1101, 1105 (Pa. Super. 2013). The level of required suspicion turns on the kind of violation in question: if it is the kind of violation that would require further investigation to prove, the officer needs a reasonable suspicion; if it is the kind of violation that is immediately apparent and would not require any further investigation, the officer needs probable cause. *Id.* In either case, the officer's authority for the seizure extends only as long as is necessary to attend to the business of the stop. *Commonwealth v. Palmer*, 145 A.3d 170, 173 (Pa. Super. 2016).

\*\*\*

In his first issue, Appellant claims that Trooper Tierney lacked probable cause to effectuate a traffic stop because the record lacks evidence showing (1) Appellant's precise rate of speed, (2) that Trooper Tierney complied with statutory law applicable to utilizing a speedometer to clock Appellant's speed, and (3) that Appellant violated the Vehicle Code by crossing over the lane dividers in an unsafe manner. Appellant's Brief at 13-19.

With respect to his claim that the record does not support the existence of probable cause to stop Appellant for speeding, Appellant asserts that the record reflects that Trooper Simcox told Appellant that he and Trooper Tierney "did not know how fast [Appellant's] vehicle was travelling." *Id.* at 15 (citing N.T. Suppression at 33). Appellant also contends that the MVR recorded an officer inside the patrol car state "he's got to be going 65," indicating that the troopers were merely "speculat[ing]" that Appellant was speeding. Appellant's Brief at 15 (citing N.T. Suppression at 35). Last, Appellant contends that the record contains no evidence regarding the exact distance over which the troopers clocked Appellant's speed; therefore, the troopers violated 75 Pa.C.S. § 3368(a), which requires police to clock a vehicle suspected of speeding for a minimum of three-tenths of a mile. Appellant's Brief at 15.

Our review of the notes of testimony belies Appellant's claim that the Commonwealth did not present any evidence of Appellant's speed. Trooper Tierney explicitly testified that he and Trooper Simcox paced Appellant "travelling at a consistent speed of 65 MPH." N.T. Suppression at 11, 32.

Although the record also reflects that Trooper Simcox told Appellant and his passenger that Trooper Simcox did not know how fast Appellant's vehicle had been travelling, Trooper Tierney explained that, as the passenger in the patrol vehicle, it was Trooper Tierney's-and not Trooper Simcox's-responsibility to monitor the speedometer. *Id.* at 33-34. Therefore, the facts of record support the suppression court's determination that, even if Trooper Simcox was unsure of Appellant's rate of speed, Trooper Tierney credibly testified that Appellant had been driving 10 miles over the speed limit before Trooper Tierney stopped him. Thus, the suppression court properly found that the troopers had probable cause to effectuate a traffic stop based on Appellant's violation of the Motor Vehicle Code.[4]

Our review also reveals that Appellant did not raise his claim that the Commonwealth failed to offer evidence proving that the troopers complied with Section 3368(a) either in his motion to suppress, at the suppression hearing, or in his Rule 1925(b) statement. Accordingly, he has waived this claim. *See* Pa.R.A.P. 302 ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal"); Pa.R.A.P. 1925(b)(4)(vii) (providing that issues not raised in the Rule 1925(b) statement are waived).

---

[4] Because the record supports the suppression court's conclusion that the troopers had probable cause to stop Appellant for speeding, we need not address Appellant's claim that the stop was illegal because the Commonwealth did not present evidence that Appellant was changing lanes unsafely.

- 11 -

***

In his second issue, Appellant contends that the trial court erred in denying his motion to suppress the drugs found in his vehicle because his consent to search was the product of an unlawful detention. Appellant's Brief at 19-30.

"Where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest." *Commonwealth v. Green*, 168 A.3d 180, 184 (Pa. Super. 2017) (citation omitted). Thus, at the point where the purpose of the initial traffic stop has concluded, the police must possess reasonable suspicion that criminal activity is occurring in order to continue the detention. *Commonwealth v. Reppert*, 814 A.2d 1196, 1202 (Pa. Super. 2002). *See also Rodriguez v. U.S.*, 575 U.S. 348, 354-55 (2015).

Demonstrating reasonable suspicion requires that the detaining officer "articulate something more than an inchoate and unparticularized suspicion or hunch" that the defendant has engaged in criminal activity. *Commonwealth v. Jefferson*, 256 A.3d 1242, 1248 (Pa. Super. 2021) (citation omitted). In determining whether the Commonwealth has met this burden, courts must make an objective inquiry into whether, based on "the facts available to [the] police at the moment of intrusion[,]" a person "of reasonable caution" would believe that the defendant has engaged in criminal activity. *Id.* (citation omitted). At the moment a mere encounter becomes

an investigative detention, police must already have the requisite reasonable suspicion that the defendant engaged in criminal activity to support that detention. *Commonwealth v. Mackey*, 177 A.3d 221, 232 (Pa. Super. 2017). "Reasonable suspicion cannot be based on information discovered after the detention has begun." *Id.*

In support of his claim that the troopers lacked reasonable suspicion to extend the traffic stop, thus rendering his consent to search the vehicle invalid, Appellant asserts that Trooper Tierney made clear that the purpose of the traffic stop was to "address the alleged speeding and driving over the dotted lines[,]" and within less than two minutes Trooper Tierney had all of the information he needed to give Appellant a ticket for his violations of the Motor Vehicle Code. Appellant's Brief at 23, 27. However, rather than just issue a ticket, Trooper Tierney used the next twenty minutes of the stop to gain Appellant's consent to search the vehicle to "address his hunch of criminal activity." *Id.* at 24. Appellant denies that the indicia of criminal activity observed by Trooper Tierney constituted facts capable of supplying reasonable suspicion to permit Appellant's continued detention. *Id.* at 27-29.

Our review of the notes of testimony indicates that Trooper Tierney provided extensive testimony found credible by the suppression court regarding the facts that gave rise to his reasonable suspicion that Appellant was engaged in criminal activity. As set forth above, these facts include that Appellant and his passenger appeared nervous and avoided making eye contact with Trooper Tierney and that Appellant took a large bite of food just

as Trooper Tierney approached Appellant's vehicle, rendering Appellant unintelligible. N.T. Suppression at 14. Trooper Tierney also testified that the rental vehicle driven by Appellant was full of trash and had numerous air fresheners hanging from the rearview mirror. *Id.* at 14-15. Trooper Tierney also found it suspicious that even though Appellant admitted to having known the passenger for months, Appellant was unable to tell Trooper Tierney the passenger's name, where the passenger lived, or where Appellant had picked him up. *Id.* at 17. To Trooper Tierney this was indicative of "what I would consider a criminal voyage." *Id.* Given this testimony pertaining to the events prior to the conclusion of the traffic stop, we conclude that the trial court did not err when it determined that Trooper Tierney articulated more than an unparticularized suspicion that Appellant was engaged in criminal activity and, thus, did not impermissibly extend the legal traffic stop.[5] Accordingly, Appellant's consent to search his vehicle was, contrary to his claim, not the product of an unlawful detention. Appellant is, thus, not entitled to relief.

Judgment of sentence affirmed.

---

[5] The notes of testimony reflect that there was video footage of the traffic stop and the troopers' interaction with Appellant that the court admitted into evidence at the suppression hearing. *See* N.T. Suppression at 24, 61. The video, however, was not included in the certified record on appeal. We remind Appellant that it is his responsibility to ensure the completeness of the record. *See Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa. Super. 2019) (*en banc*) ("Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty.").

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/14/2025