J-A10034-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| NNAEMEKA RAPHAEL ANI | : | |
| | : | |
| Appellant | : | No. 465 MDA 2021 |

Appeal from the Judgment of Sentence Entered October 13, 2020
In the Court of Common Pleas of Centre County
Criminal Division at No(s):  CP-14-CR-0000210-2019

BEFORE:  PANELLA, P.J., KUNSELMAN, J., and KING, J.

MEMORANDUM BY KING, J.:                              **FILED: JULY 21, 2022**

Appellant, Nnaemeka Raphael Ani, appeals from the judgment of sentence entered in the Centre County Court of Common Pleas, following his jury trial convictions for rape by forcible compulsion, sexual assault, aggravated indecent assault without complainant's consent, aggravated indecent assault by forcible compulsion, criminal trespass, indecent assault by forcible compulsion, and indecent assault without complainant's consent.[1]  We affirm.

The relevant facts and procedural history of this case are as follows.  On October 18, 2017, E.R. reported that an individual broke into her apartment at 1003 West Aaron Drive and raped her.  She stated that she was sleeping

---

[1] **See** 18 Pa.C.S.A. §§ 3121, 3124.1, 3125(a)(1), 3125(a)(2), 3503, 3126(a)(2), and 3126(a)(1), respectively.

when she was awoken by someone entering her room. The assailant took off her sweatpants and underwear and penetrated her with both his penis and fingers. After the attack, he got off the bed and dropped a very large wallet while putting his pants on. The assailant picked up the wallet and ran out the door. E.R. screamed for her roommate and the two women called the police and described the assailant as an unknown black male, approximately 5' 8" tall, wearing grey sweatpants and a blue shirt. E.R. was taken to the hospital where she underwent a sexual assault examination and physical exam.

After responding to E.R.'s apartment, police collected evidence including E.R.'s clothing and sheets, a used condom, an open condom wrapper, and a box of condoms. Officers also collected DNA swabs from E.R.'s consensual sexual partner. The case went unsolved for over a year.

Over the next couple years police received multiple reports of break-ins in the West Aaron Drive apartment complex. On December 15, 2018, police received information that a male intruder had entered a female's apartment. Upon responding, police discovered a footprint was left by the intruder. Later that morning, police received a call from Cheyenne Chandler, stating that she saw a person enter her bedroom in dark clothing; however, the individual was scared off by Ms. Chandler's dog.

Two days later, on December 17, 2018, at about 6:45 a.m., Ms. Chandler and her friend again noticed a person attempting to break into her apartment, and immediately called the police. Ms. Chandler described the

suspect as an African American male, average height and build, who was wearing a dark hoodie. Sergeant Devon Moran, the responding officer, was aware of previous incidents of criminal trespass, sexual assault, and burglary in the West Aaron Drive apartment complex. He arrived at the complex within five minutes of the complaint. Sergeant Moran observed Appellant, who was of average height and thin build, wearing a dark hoodie, walking on the sidewalk about 200 feet from the apartment. When Sergeant Moran doubled back, Appellant took an evasive hard right turn, exited a common entrance to one of the buildings, and began to jog away from the officer. Sergeant Moran caught up with Appellant and identified himself as police.

Appellant told Sergeant Moran that he had been out jogging; however, the sergeant stated that Appellant's explanation did not make sense because Appellant was wearing pajama pants and a heavy hooded sweatshirt and had a very thick wallet in his left pocket. Sergeant Moran asked for Appellant's identification and informed him that there were reports of recent break-ins in the area. Appellant had a very thick wallet with him, with many cards in it. Appellant could not produce identification, but he agreed to return to his apartment with the officer to get his ID. As they walked back, Sergeant Moran observed Appellant's footprint on the pavement and believed it was a likely match to the footprint left by the intruder in the December 15, 2018 trespass.

Detective Caleb Clouse, who was one of the lead investigators of the October 2017 rape of E.R., was at the police station on December 17, 2018,

heard the call come in about another trespass on West Aaron Drive, and responded to the scene. Detective Clouse accompanied Appellant to his apartment so that Appellant could find his ID. At this point, Detective Clouse had already concluded that probable cause existed to obtain a warrant for a DNA sample from Appellant to compare it to the unsolved rape case. The detective based this conclusion on the location (the trespass occurred within 100 yards of the rape victim's apartment), and the fact that Appellant matched the physical description that E.R. had provided to police and was carrying a large wallet similar to that which E.R. reported her attacker had dropped. Furthermore, Appellant's statement that he had been jogging was not consistent with his attire and the thick wallet he was carrying.

After Appellant retrieved his ID, Detective Clouse told him that there had been a sexual assault in the area and asked if Appellant would give a DNA sample so police could compare it with the DNA that they had from the perpetrator. Appellant refused. Officers then proceeded to question Appellant for over an hour. Detective Clouse left the apartment at this time to apply for a search warrant for Appellant's DNA, clothing, and cell phone. The officers did not issue Appellant *Miranda*[2] warnings at any time during the apartment questioning.

Police then escorted Appellant to the station where officers read him

_____

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

- 4 -

*Miranda* warnings and then continued questioning him. Appellant initially stated that he felt pressured and was given a short break, but then questioning resumed despite Appellant requesting an attorney. During his time at the police station, Appellant asked for an attorney at least three times, but he was informed that he could not call a private attorney.

Later that afternoon, police obtained and executed a search warrant for Appellant's DNA and to recover Appellant's clothing and cell phone.[3] Police subsequently obtained a search warrant for Appellant's records from a counseling and psychological services (CAPS) program at Penn State University.

On March 1, 2019, the Commonwealth filed an information charging Appellant with rape, sexual assault, two counts of aggravated indecent assault, criminal trespass, and two counts of indecent assault, based on the October 18, 2017 rape of E.R.[4] On April 4, 2019, Appellant filed an omnibus pre-trial motion seeking, *inter alia*, suppression of all statements he made before he was taken to the police station, statements he made at the police

_____

[3] The Pennsylvania State Police Bureau of Forensic Services lab reported findings on January 11, 2019. It found that Appellant's DNA matched the DNA profile obtained from swabs of sperm taken from the victim and from a condom found at the scene.

[4] On February 27, 2019, the Commonwealth filed notice of consolidation of the rape case with the two criminal trespass cases. Appellant filed a motion to sever the rape case from the criminal trespasses, which the trial court granted on November 15, 2019.

station, and all evidence collected following the making of these statements, including the DNA evidence. Appellant also sought authorization to hire an expert in DNA analysis. He filed a supplemental omnibus motion on May 7, 2019, seeking suppression of the CAPS reports from Penn State University.

The court conducted a suppression hearing on May 10, 2019, and May 23, 2019. On November 15, 2019, the trial court entered an opinion and order granting the omnibus pretrial motion in part and denying it in part. Specifically, the court found that Appellant's encounter with police on December 17, 2018, became custodial soon after entering the apartment, and that he was subject to interrogation during the time he was in the apartment.[5] (Trial Court Opinion, 11/15/19, at 20-22). Therefore, the court suppressed any incriminating statements made by Appellant while in the apartment. The court also suppressed incriminating statements Appellant made while interrogated at the police station. The court decided that after officers read Appellant his **Miranda** rights, Appellant requested an attorney and was not provided one. (**Id.** at 25-26). The court noted that "contrary to the Commonwealth's argument, [Appellant] was not told he could call a private attorney if he chose; quite the opposite, he was informed he did not have the right to a phone call when asked about being able to do so." (**Id.** at 26)

_____

[5] The court noted that Appellant did not challenge the initial stop and questioning on the street by Sergeant Moran. (Trial Court Opinion, 11/15/19, at 20 (citing Def.'s Resp. Br. Supp, Omnibus Mot., 8-6-19, at 1)).

(emphasis and footnote omitted).

Nevertheless, the court found that the material facts supporting the warrant for a DNA sample (namely, Appellant's clothing and his cellphone) had been established before the interrogation in Appellant's apartment. Therefore, the court did not suppress the DNA evidence collected pursuant to this warrant. (*Id.* at 28-29). Furthermore, the court found that looking at the totality of the circumstances set forth in the affidavit for the warrant, the information sufficiently established a fair probability that Appellant's DNA, clothing, and cell phone would yield evidence related to the 2017 rape investigation, and therefore denied Appellant's motion to suppress based on lack of probable cause. (*Id.* at 35). The court granted Appellant's motion seeking funds for a DNA expert.

Regarding the supplemental omnibus motion, the court granted suppression of Appellant's records from CAPS, finding that it constituted "fruit of the poisonous tree," because police would not have known Appellant was seeing a counselor at CAPS absent the unlawful interrogation. (*Id.* at 31).

While this case was pending, police received another report of a criminal trespass similar in nature to those that occurred at the West Aaron Drive apartment complex. This incident occurred at the University Terrace Apartments, where Appellant was residing at the time. The incident occurred on November 2, 2019, at about 7:40 a.m. Complainant N.B. was in bed and heard her bedroom door creak open and someone turn a phone flashlight on.

N.B. realized that she did not know the person and pretended to be asleep. She then slowly turned toward the door, at which point the intruder turned and ran away. N.B. then called the police. Police were able to obtain a copy of a surveillance video from the University Terrace Apartments, which revealed an individual identified by police as Appellant entering N.B.'s apartment.

On June 24, 2020, Appellant filed a motion to produce any evidence allegedly containing DNA from the alleged perpetrator for the purpose of independent DNA testing at a facility of Appellant's choosing. After a hearing, the court denied the motion on August 3, 2020, as untimely.

On August 5, 2020, and August 14, 2020, the Commonwealth filed motions *in limine* to introduce at Appellant's rape trial "prior bad act" evidence per Pa.R.E. 404(b) concerning the criminal trespasses from 2018 (regarding Ms. Chandler's apartment) and 2019 (regarding N.B.'s apartment). On August 14, 2020, the Commonwealth filed a motion to permit N.B. to testify via two-way simultaneous audio-visual communication, about the 2019 criminal trespass. The court conducted a pre-trial motions hearing on August 21, 2020. On August 27, 2020, the court granted the Commonwealth's motions to introduce prior bad acts, and to permit N.B. to testify via advanced communications.

Following a four-day trial, the jury convicted Appellant of the above-mentioned offenses on September 3, 2020. On October 13, 2020, the court

sentenced Appellant to five and one half to eleven years' imprisonment, followed by three years of probation for rape, and imposed a consecutive three to six years' imprisonment followed by three years of probation for aggravated indecent assault. The court imposed no separate sentence on the remaining counts.[6] The sentence imposed was a standard range sentence.

Appellant timely filed a post-sentence motion on October 22, 2020, and a supplemental post-sentence motion on February 2, 2021. After argument, the court denied the motions on March 19, 2021. Appellant filed a timely notice of appeal on April 15, 2021. On April 16, 2021, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant filed his concise statement on May 4, 2021.

Appellant raises five issues on appeal.

> I. Whether the trial court committed reversible error in failing to suppress the DNA evidence, clothing, cell phone, and other fruit of the poisonous tree since this evidence was obtained as a result of an unlawful detention because the officer lacked reasonable suspicion and/or probable cause to justify the detention in violation of Article I, Section 8 of the Pennsylvania Constitution as well as the Fourth and Fourteenth Amendments of the United States Constitution?
>
> II. Whether the trial court committed reversible error in failing to suppress the DNA evidence, clothing, cell phone, and other fruit of the poisonous tree since there was no probable cause to support the issuance of the underlying search warrant pertaining to the rape case in contravention

---

[6] Some of the convictions merged for sentencing purposes, and the court imposed no further penalty for criminal trespass.

of Article I, Section 8 of the Pennsylvania Constitution as well as the Fourth and Fourteenth Amendments of the United States Constitution?

III. Whether the trial court committed legal error in denying [Appellant's] motion to produce evidence in the nature of the material that was available for testing for the presence of DNA since the production of the remaining DNA sample was mandatory, the Commonwealth's discovery obligations were continuing, and there are no time limits when the production is in the interests of justice?

IV. Whether the trial court abused its discretion and committed reversible error by admitting into evidence at trial prior bad acts in the nature of other subsequent trespasses, which allegedly occurred more than a year and two years after the alleged rape reportedly occurred since this later ruling violated the coordinate jurisdiction rule, the evidence lacked any unique signature, and was more prejudicial than probative of any fact of consequence?

V. Whether the trial court erred by permitting the testimony of N.B. to be presented via two-way simultaneous audio-visual communications where there was no compelling or legally permissible reason to do so, which was a violation of [Appellant's] Sixth Amendment and Article I, Section 9 right to confront witnesses against him at trial?

(Appellant's Brief at 6-8).

In his first issue, Appellant challenges the trial court's denial of his motion to suppress the DNA from his buccal swab, his clothing, and his cellphone, claiming Sergeant Moran lacked reasonable suspicion and/or probable cause to justify the initial detention of Appellant on the street. As a preliminary matter, however, we must decide whether Appellant preserved this issue for appeal.

Pennsylvania Rule of Criminal Procedure 581 governs the suppression

of evidence, and provides in pertinent part:

### Rule 581.  Suppression of Evidence

\*    \*    \*

   **(B)**   Unless the opportunity did not previously exist, or the interests of justice otherwise require, such motion shall be made only after a case has been returned to court and shall be contained in the omnibus pretrial motion set forth in Rule 578.  If timely motion is not made hereunder, the issue of suppression of such evidence shall be deemed to be waived.

Pa.R.Crim.P. 581(B).  "It is therefore quite clear that under the imperative language of this rule, a motion to suppress evidence must be made pretrial, unless the opportunity did not previously exist, or the interests of justice otherwise require."  **Commonwealth v. Long**, 753 A.2d 272, 279 (Pa.Super. 2000) (citation and internal quotation marks omitted).   "Whether the opportunity did not previously exist or the interests of justice otherwise require is a matter for the discretion of the trial judge."   **Id.** (quoting **Commonwealth v. Cooke**, 394 A.2d 1271, 1274 (Pa.Super. 1978)).

   Instantly, the record shows that in his April 4, 2019 motion to suppress, Appellant challenged the initial stop by Sergeant Moran.  (Motion to Suppress, 4/4/19, at 3-5).  Appellant later abandoned his challenge.  (**See** Def.'s Resp. Br. Supp, Omnibus Mot., 8/6/19, at 1) (stating: "[Appellant] is not contesting that Sergeant Moran would have been able to perform a **Terry**[7] stop for

---

[7] **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

further investigation"). When it issued its suppression ruling opinion, the trial court observed that Appellant did not contest the initial stop.[8]

Because Appellant expressly abandoned his challenge to the legality of the initial stop prior to the trial court ruling on his suppression motion, he did not adequately preserve his claim as required by Rule 581. *See* Pa.R.Crim.P. 581(B). Therefore, Appellant's first issue is waived.

Moreover, even if he had preserved his challenge to the legality of the initial stop, Appellant's claim would fail on the merits. Appellant argues that the general description of the suspects in the prior incidents, including the description from the 2017 rape, was not sufficiently similar to that of Appellant to create the reasonable suspicion necessary to detain Appellant. (Appellant's Brief at 30-32). We disagree.

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. H. Williams*, 941 A.2d 14, 26 (Pa.Super. 2008) (*en banc*) (internal citations omitted).

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a

---

[8] Moreover, the court stated in a footnote that "[b]ased on the facts as established at the suppression hearings, it is clear Sergeant Moran had reasonable suspicion that [Appellant] was involved in criminal activity so as to justify an investigatory detention of [Appellant]." (Trial Court Opinion, 11/15/19, at 20 n.1).

whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Id.* at 27 (internal citations and quotation marks omitted). The reviewing court's scope of review is limited to the evidentiary record of the pre-trial hearing on the suppression motion. ***In re L.J.***, 622 Pa. 126, 79 A.3d 1073 (2013).

Contacts between the police and citizenry fall within three general classifications:

> The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Goldsborough***, 31 A.3d 299, 305 (Pa.Super. 2011), *appeal denied*, 616 Pa. 651, 49 A.3d 442 (2012) (quoting ***Commonwealth v. Bryant***, 866 A.2d 1143, 1146 (Pa.Super. 2005), *appeal denied*, 583 Pa. 668, 876 A.2d 392 (2005)). Police must have reasonable suspicion that a person seized is engaged in unlawful activity before subjecting that person to an investigative detention. ***Commonwealth v. Cottman***, 764 A.2d 595 (Pa.Super. 2000).

An "investigative detention" is interchangeably labeled as a "stop and frisk" or a "***Terry*** stop." ***Commonwealth v. Brame***, 239 A.3d 1119

(Pa.Super. 2020), *appeal denied*, ___ Pa. ___, 251 A.3d 771 (2021).

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.
>
> *   *   *
>
> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity.

**Commonwealth v. Jones**, 874 A.2d 108, 116 (Pa.Super. 2005) (internal citations omitted).

"[T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." **Cottman, supra** at 598-99 (quoting **Commonwealth v. Beasley**, 761 A.2d 621, 625-26 (Pa.Super. 2000), *appeal denied*, 565 Pa. 662, 775 A.2d 801 (2001)).

> In making this determination, we must give due weight...to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further

- 14 -

investigation by the police officer.

***Commonwealth v. Young***, 904 A.2d 947, 957 (Pa.Super. 2006), *appeal denied*, 591 Pa. 664, 916 A.2d 633 (2006) (internal citations and quotation marks omitted). "These circumstances are to be viewed through the eyes of a trained officer." ***Commonwealth v. Jackson***, 907 A.2d 540, 543 (Pa.Super. 2006).

Instantly, Sergeant Moran testified at the suppression hearing that he worked as a patrol sergeant for the Ferguson Township Police Department. (N.T. Suppression Hearing, 5/10/19, at 9). He explained that he was on duty on December 17, 2018 and responded to the call that came in about a possible criminal trespass involving a college-aged African American male wearing a dark sweatshirt or coat, and who was thin to average build and average height, who was on the individual's back porch trying to gain entry using a flashlight. (***Id.*** at 11-12). Sergeant Moran had responded to the 2017 rape, and he was familiar with some of the other calls for criminal trespass and burglaries in the area, including the call from the same apartment two days prior. (***Id.*** at 12).

Sergeant Moran testified that when he arrived on scene, he saw Appellant who matched the physical description of the intruder. (***Id.*** at 15, 17). Sergeant Moran doubled back to take a better look at him, at which point Appellant made an "unnatural" very hard right turn and started running. (***Id.*** at 16). Sergeant Moran then stated that "based off of my observations, based

off of the known facts, the walking and changing direction and him running away from me, I believe I needed and had reasonable suspicion to identify him." (*Id.* at 17).

The record supports the trial court's decision that Sergeant Moran had reasonable suspicion to conduct an investigatory detention. Under the totality of the circumstances, Sergeant Moran had articulable specific observations including Appellant's location, appearance, and actions that led Sergeant Moran reasonably to conclude, in light of his experience, that criminal activity was afoot and that Appellant was involved in that activity. *See Jones, supra*; *Cottman, supra*; *Young, supra*. Therefore, Appellant's first issue is waived, but would not merit relief even if properly preserved.

In his second issue, Appellant argues that the trial court erred when it denied suppression of the DNA evidence, clothing, and cell phone where police lacked probably cause to support the search warrant. Appellant contends that the affidavit of probable cause was vague concerning the description of the individual who reportedly committed the rape, and the individual who committed the criminal trespasses. Appellant claims that "[c]ountless individuals within the State College area…match the sweeping description of a dark-skinned black male, slender/muscular built with short black hair." (Appellant's Brief at 36) (record citation and quotation marks omitted). Appellant further asserts that the type of clothing worn by the suspected rapist is not unique for the average college student, and that the dark coat or jacket

worn in several of the trespassing incidents was not mentioned in the rape case. Appellant insists that there was no DNA evidence recovered in the trespassing cases, so the only purpose of the request for a buccal swab was for the rape case, and the affidavit did not establish a fair probability that Appellant's DNA would match the DNA collected from the rape. (*Id.* at 37). Appellant concludes the court improperly denied his suppression motion, and this Court must grant relief. We disagree.

"In this jurisdiction, in determining whether probable cause for issuance of a warrant is present, the 'totality of the circumstances' test set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), was adopted in *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985)." *Commonwealth v. Murphy*, 916 A.2d 679, 681-82 (Pa.Super. 2007), *appeal denied*, 593 Pa. 739, 929 A.2d 1161 (2007). "Under such a standard, the task of the issuing authority is to make a practical, common sense assessment [of] whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 682. "A magistrate's finding of probable cause 'must be based on facts described within the four corners of the [supporting] affidavit[.]" *Commonwealth v. Smith*, 784 A.2d 182, 185 (Pa.Super. 2001) (quoting *Commonwealth v. Stamps*, 493 Pa. 530, 536, 427 A.2d 141, 143 (1981)).

"Under our law, the focus is on the information provided to the issuing authority and its response to that information." *Commonwealth v.*

*Huntington*, 924 A.2d 1252, 1256 (Pa.Super. 2007), *appeal denied*, 593 Pa. 746, 931 A.2d 656 (2007) (emphasis omitted).

> The role of the reviewing court and the appellate court is to ascertain whether the issuing magistrate appropriately determined that probable cause existed for the issuance of the warrant. Probable cause is based on a finding of probability and does not require a *prima facie* showing of criminal activity. Both the reviewing court and this Court must accord deference to a magistrate's finding of probable cause.

*Id.* (internal citations omitted).

Instantly, in addressing Appellant's suppression issue, the trial court explained:

> In the case at bar, looking to the affidavit for [Appellant's] DNA, cellphone and clothing…the affidavit of probable cause accompanying the warrant application for these items consists of six type-written pages describing the numerous criminal trespass cases that had occurred in the West Aaron Drive Apartment Complex, the sexual assault that occurred in the same area in October of 2017, and several burglary cases from the area. The affidavit sets forth a description of ten different criminal incidents or incidents of suspicious activity (ending with the December 17, 2018 incident) which had been linked by the FTPD as possibly related "because of their nature, the location of the incidents, and the description of the perpetrator." (***See*** Aff. Probable Cause, at 3). The description of the perpetrator in most all of the incidents was of a black male, slender build, between 5'8" and 6'1" in height. Several of the descriptions included that the suspect had short hair. The perpetrator in most of the incidents was described as wearing sweatpants, dark baggie pants or flannel pajama pants; he was described as wearing a puffy coat in two of the incidents, and a hooded coat or sweatshirt in two others. One account included the detail that he had a small amount of facial hair. The affidavit recites that footprints had been found at one of the crime scenes. (***See id.*** at 5-6).

The October 2017 rape case being investigated by Detective Clouse was described in detail in the affidavit. The affidavit recites that the complainant in that case reported being sexually assaulted by an unknown black male, approximately 5'8" in height, who was wearing grey sweatpants and a blue shirt. The victim's account of the incident is described in detail, including that she was not certain whether the suspect had ejaculated in her vagina or in a condom. She described having seen her attacker when he got up. She described a dark skinned black male with a slender/muscular build and short black hair. She recalled he had dropped a brown or black wallet, which he picked up before fleeing. Evidence collected at the crime scene included a used condom, a box of condoms, and an opened condom wrapper. The affidavit further notes that, on February 15, 2018, Detective Clouse was advised by PSP laboratories that a CODIS-eligible DNA profile was present in the sample submitted from the October 2017 sexual assault case.

All of the cases involved trespasses in the West Aaron Drive Apartment Complex, a relatively small geographical area, and none of the cases involved forced entry. Several of the victims observed the suspect with a flashlight or cellphone light looking into apartments.

In addition to the previous incidents of potentially related unresolved crimes and criminal activity, the affidavit of probable cause described the encounter with [Appellant] on December 17, 2018. The affidavit notes that Sergeant Moran arrived at the West Aaron Drive Apartment Complex shortly after receiving the complaint of suspicious activity in which a person had attempted to enter Apartment A6 at 1100 West Aaron Drive and had been shining a light into the apartment. Two trespass incidents from December 15 were noted to have occurred in the same Complex, as well as previous crimes, and the affidavit stated Sergeant Moran believed the suspect might still be in the area. One of the December 15 incidents involved the victim awakening to find an unknown male, less than 6' tall, of thin build and wearing a hooded sweatshirt, in her bedroom.

The suspect for the December 17, 2018 incident was described as a male of average height and thin build,

- 19 -

wearing a hooded shirt or coat. The affidavit described how Sergeant Moran encountered an individual potentially fitting the description when he arrived at the West Aaron Drive Apartment Complex, and that [Appellant] appeared to take evasive action and then fled from Sergeant Moran. The encounter with Sergeant Moran after [Appellant] stopped is described, and [Appellant] is described as having worn a dark colored jacket with a hood and multicolored night pants. He had a wallet with many cards in it but claimed to have no identification. He lived in the West Aaron Drive Apartment Complex. The affidavit recites having observed [Appellant's] shoeprint on the sidewalk that morning, and that it had a triangular pattern in the heel with multiple rectangular patterns running up the front. The affidavit states that Sergeant Moran believed the shoeprint to be the same as the print from the prior criminal incident days earlier. Shoeprints were also noted to have been observed at the rear deck of 1100 West Aaron Drive, Apartment A6, the apartment where the December 17, 2018 incident occurred. One of those prints had the same pattern.

In addition to the details of each of the potentially related incidents, the affidavit summarizes the similarities among the incidents and the description of the perpetrator in each, and describes the suspected relationship to [Appellant].

(Trial Court Opinion, 11/15/19, at 32-35).

The court determined that probable cause supported the issuance of the

warrant, stating:

Looking at the affidavit through the non-technical lens of common sense, the totality of the circumstances involved the close proximity of all of the unsolved crimes and also of [Appellant's] apartment, the similarity in the numerous trespasses occurring over the course of more than one year in the area, the similarity of [Appellant's] appearance and clothing to the descriptions given relative to the perpetrators of the crimes, the apparent match of [Appellant's] shoeprint to a print from a prior trespass involving entry into a bedroom, [Appellant's] presence in the area where the December 17, 2018 crime occurred on arrival of the police that morning, and his apparent attempt

- 20 -

> to flee from Sergeant Moran that morning. The [c]ourt concludes this information is sufficient to establish a fair probability that [Appellant's] DNA, clothing and cell phone would yield evidence related to the 2017 sexual assault under investigation and the various other criminal trespasses that had occurred in the same general area over the course of a little more than one year, including the trespass from December 17, 2018. Accordingly, the [c]ourt finds no merit in [Appellant's] motion to suppress based on lack of probable cause for the warrant.

(**Id.** at 35). Our review of the record supports the court's determination that there was a fair probability that a search of Appellant's DNA, clothing, and cell phone would provide evidence related to the 2017 rape. **See Murphy, supra**. On this record, Appellant is not entitled to relief. **See H. Williams, supra**.

In his third issue, Appellant argues that the court erred when it denied his discovery motion requesting production of the remaining DNA sample. Appellant claims that the trial court's denial of his motion as untimely "wholly denied [him] a fair [t]rial," and without access to the DNA sample, he was denied the ability to present competent evidence in his defense. (Appellant's Brief at 44). Appellant asserts that production of the remaining DNA evidence was mandatory, and the motion was timely in light of the notice exceptions set forth in Rule 579. Appellant concludes the court was obligated to compel production of the DNA evidence and the court abused its discretion by not doing so. (**Id.** at 46). We disagree.

We review a trial court's denial of a motion to produce evidence for an abuse of discretion. **Commonwealth v. Tyson**, 119 A.3d 353, 357-58 (Pa.Super. 2015), *appeal denied*, 633 Pa. 787, 128 A.3d 220 (2015) (internal

citations omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id.* (citation omitted). "We will reverse [the] trial court's decision...only if the appellant sustains the heavy burden to show that the trial court has abused its discretion." *Commonwealth v. Christine*, 633 Pa. 389, 397, 125 A.3d 394, 398 (2015) (citation omitted).

Instantly, the court denied Appellant's motion to produce DNA evidence as untimely. The court found that the motion was filed more than 14 months after the original omnibus pretrial motion deadline[9] and at least seven months after the court issued its decision on the original omnibus pretrial motion. (Order, 5/4/21). The court explained:

> On November 15, 2019, [Appellant] was awarded $1,500 to hire a DNA expert. The funds were made available to him on November 18, 2019. [Appellant] filed a motion to produce evidence on June 24, 2020 seeking "the condom, condom swabs, thigh swabs, vaginal swabs, vulva swabs,

---

[9] Rule of Criminal Procedure 579 sets forth that

> the omnibus pretrial motion for relief shall be filed and served within 30 days after arraignment, unless opportunity therefor did not exist, or the defendant or defense attorney, or the attorney for the Commonwealth, was not aware of the grounds for the motion, or unless the time for filing has been extended by the court for cause shown.

Pa.R.Crim.P. 579(A).

and any other items or swabs that allegedly contained DNA from the alleged perpetrator" for the purpose of "independent testing [at] a facility or laboratory of [Appellant's choosing]." [The trial] court's order, dated August 3, 2020, denied [Appellant's] motion to produce evidence on the grounds that [Appellant's] motion was filed more than fourteen (14) months after the original omnibus pretrial motion deadline, and at least seven (7) months after the court issued its decision on the original omnibus pretrial motion. [Appellant] failed to file any motion, or in any way bring to the court's attention, that he was in need of more funds. Given [Appellant's] indigency, had he done so, this court could have provided [Appellant] with financial assistance. The record reflects numerous instances in this multi-year case where [Appellant] acknowledged the need for independent DNA analysis. Despite this, [Appellant] did not file any type of motion for access to the evidence until two (2) months prior to trial. The court felt [Appellant's] motion was an attempt to procure postponement of the trial.

(Trial Court Opinion, 3/19/21, at 3) (some capitalization omitted).

The record supports the trial court's decision. Appellant was aware of the significance of the DNA evidence as early as his April 4, 2019 omnibus pretrial motion; however, he did not file a motion to produce that evidence until June 24, 2020, less than two months prior to the start of the jury trial. Therefore, we see no abuse of discretion by the court in deciding that Appellant's late filing of the motion to produce DNA evidence wan an attempt to delay trial. Appellant's third issue merits no relief.

In his fourth issue, Appellant argues the court erred by granting the Commonwealth's motion *in limine* to admit evidence of the other criminal trespasses at his rape trial. Appellant asserts two different bases for the court's error, first that it violated the coordinate jurisdiction rule, and second

that it was a misapplication of Rule of Evidence 404(b).

Appellant claims that the court's ruling violated the coordinate jurisdiction rule because the court admitted evidence from the trespasses despite the cases having been severed from the rape trial. Specifically, Appellant contends that the trial court should have been bound by the suppression court's finding that prejudice would inure if the criminal trespass information was admitted at trial. (Appellant's Brief at 51).

Regarding the Rule 404(b) analysis, Appellant insists that admission of evidence of other criminal trespasses at Appellant's rape trial was an abuse of discretion. Appellant contends that Rule 404(b) permits admission of bad acts evidence only upon a showing of a distinct and unique methodology. Appellant claims that the act of entering a building on multiple occasions is not a unique methodology as related to an alleged rape that occurred in a different year. (*Id.* at 54). Appellant further avers that the probative value of this evidence is outweighed by its potential for unfair prejudice. (*Id.* at 55-56). For all of these reasons, Appellant concludes the court erred by granting the Commonwealth's motion *in limine*. We disagree.

Our standard of review of a trial court's admission or exclusion of evidence is well established and very narrow:

> Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the

> result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

*Commonwealth v. Montalvo*, 604 Pa. 386, 403, 986 A.2d 84, 94 (2009), *cert. denied*, 562 U.S. 857, 131 S.Ct. 127, 178 L.Ed.2d 77 (2010) (internal citations and quotation marks omitted). Our scope of review in cases where the trial court explains the basis for its evidentiary ruling is limited to an examination of the stated reason. *Commonwealth v. Stephens*, 74 A.3d 1034, 1037 (Pa.Super. 2013). "We must also be mindful that a discretionary ruling cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." *Commonwealth v. O'Brien*, 836 A.2d 966, 968 (Pa.Super. 2003), *appeal denied*, 577 Pa. 695, 845 A.2d 817 (2004).

"Pennsylvania's well-established Law of the Case Doctrine bars a judge from revisiting rulings previously decided by another judge of the same court, absent exceptional circumstances." *Commonwealth v. Lancit*, 139 A.3d 204, 206-07 (Pa.Super. 2016), *appeal denied*, 640 Pa. 543, 164 A.3d 465 (2016) (citing *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326 (1995)). The "coordinate jurisdiction rule falls squarely within the ambit of a generalized expression of the 'law of the case' doctrine." *Starr, supra* at 574, 664 A.2d at 1331. This rule provides that "judges of coordinate jurisdiction sitting in the same case should not overrule each others' decisions." *Id.* at 573, 664 A.2d at 1331 (citation omitted). Nevertheless, "the rule does not apply where two motions differ in kind[;] then a second judge is not precluded from granting relief though another judge has denied an earlier motion."

- 25 -

*Commonwealth v. Taylor*, ___ A.3d ___, 2022 PA Super 103, 2022 WL 1815527 at *4 (Pa.Super. 2022). "In deciding whether to apply the coordinate jurisdiction rule, the court must look to where the rulings occurred in the context of the procedural posture of the case." *Id.* at *3.

Here, the court initially granted Appellant's motion to sever the rape case from the 2018 criminal trespass cases. Later in the proceedings, the court granted the Commonwealth's motion *in limine* to admit evidence of the criminal trespass cases in the rape case. Importantly, the two motions were different in kind, with different legal standards governing a decision on those motions. *Compare* Pa.R.Crim.P. 583 (stating court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together) *with* Pa.R.E. 404(b) (permitting evidence of other crimes, wrongs, or acts to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, so long as probative value of evidence outweighs its potential for unfair prejudice). Thus, the rule does not apply because the court's earlier ruling involved a motion for separate trials, not the admission of evidence at those trials. *See Taylor, supra*. *See also Commonwealth v. Bibbs*, No. 356 WDA 2021 (Pa.Super. Apr. 8, 2022) (unpublished memorandum)[10] (holding coordinate jurisdiction rule was not

---

[10] *See* Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019).

implicated where one trial judge decided issue of motion for separate trials, not admission of evidence at those trials).

With respect to the Rule 404(b) analysis, in general, evidence is admissible if it is relevant, that is, "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Commonwealth v. J. Williams**, 586 Pa. 553, 581, 896 A.2d 523, 539 (2006) (citation omitted); Pa.R.E. 402.

Pennsylvania Rule of Evidence 404(b) provides as follows:

**Rule 404.  Character Evidence; Crimes or Other Acts**

\*   \*   \*

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses*.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses*.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2).

This Court has explained:

It is settled law in this Commonwealth that other bad acts evidence is inadmissible to prove a defendant's propensity to commit crime.  **Commonwealth v. Brookins**, 10 A.3d

1251, 1256 (Pa.Super. 2010), *appeal denied*, 610 Pa. 625, 22 A.3d 1033 (2011). Nonetheless, bad acts evidence may be introduced for other limited purposes, including, but not limited to, establishing motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, common scheme or design, *modus operandi*, and the natural history of the case. **Id.**; Pa.R.E. 404(b)(2). This evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

It has been succinctly stated that (t)he purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit that crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus effectually to strip him of the presumption of innocence.

*Commonwealth v. Spruill*, 480 Pa. 601, 604–05, 391 A.2d 1048, 1049 (1978).

**Commonwealth v. Kinard**, 95 A.3d 279, 284 (Pa.Super. 2014). "The '*res gestae* exception' to the general proscription against evidence of other crimes, is also known as the 'complete story' rationale, *i.e.*, evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." **Commonwealth v. Brown**, 52 A.3d 320, 326 (Pa.Super. 2012), *appeal denied*, 619 Pa. 676, 62 A.3d 377 (2013) (internal citation omitted).

Instantly, the trial court agreed with the Commonwealth that evidence regarding the trespass incidents on December 15 and 17, 2018 was admissible in the rape case "to complete the story" so that the jury would understand

why police stopped Appellant on December 17, 2018. Further, the court found that evidence in the December trespass cases demonstrated Appellant's surreptitious entry/attempted entry into a female's apartment such that the "evidence will tend to show how [Appellant] planned or executed the criminal act at issue in this [rape] case as part of his common plan or scheme." (Trial Court Opinion, 8/27/20, at 8). Finally, the court granted the Commonwealth's motion *in limine* seeking to admit evidence of Appellant's alleged trespass at N.B.'s apartment in 2019 because Appellant's actions were similar to those addressed in the December 15 and 17, 2018 trespasses as well as the present rape case, all tending to show his common, distinctive scheme of trespassing and entering female apartment residences in close proximity to his residence. (*Id.* at 8-9). Under the facts of this case, we cannot say the court abused its discretion in concluding that the evidence tended to show a common plan or scheme. **See Kinard, supra**; **Brown, supra**.

Further, we note that "when examining the potential for undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence." **Commonwealth v. Hairston**, 624 Pa. 143, 160, 84 A.3d 657, 666 (2014). **See also Commonwealth v. Sherwood**, 603 Pa. 92, 115, 982 A.2d 483, 497-98 (2009) (holding that cautionary instructions were sufficient to ameliorate undue prejudice caused by introduction of bad acts evidence). "Jurors are presumed to follow the trial court's instructions." **Hairston, supra** (citing **Commonwealth v. Baker**, 531 Pa. 541, 614 A.2d

663 (1992)). Here, prior to introduction of the evidence of the trespasses, the court provided a limiting instruction to the jury concerning how the evidence should be considered. (**See** N.T. Trial, 8/31/20, at 136-37). Thus, the court's cautionary instruction ameliorated any undue prejudice caused by introduction of the prior bad acts. **See Hairston, supra**; **Sherwood, supra**. Accordingly, Appellant's fourth issue merits no relief.

In his final issue on appeal, Appellant argues the trial court erred when it granted the Commonwealth's motion *in limine* to permit N.B. to testify via two-way simultaneous audio-visual communication, rather than in person. Appellant asserts that this method of presenting N.B.'s testimony violated his constitutional rights under the Confrontation Clause. We disagree.

"When reviewing a question of law, our standard of review is *de novo*, and our scope of review is plenary." **Commonwealth v. Atkinson**, 987 A.2d 743, 749 (Pa.Super. 2009), *appeal denied*, 608 Pa. 614, 8 A.3d 340 (2010).

> The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ..." Article 1, Section 9 of the Pennsylvania Constitution provides: "In all criminal prosecutions the accused hath a right ... to be confronted with the witnesses against him...." With regard to the Confrontation Clause, the Pennsylvania Constitution provides a criminal defendant with the same protection as the Sixth Amendment; thus, we will address Appellant's challenges under each Constitution simultaneously.

**Id.** at 745 (footnotes and citation omitted).

The United States Supreme Court considered the issue of whether use

of one-way video testimony for child victims violated the Confrontation Clause in **Maryland v. Craig**, 497 U.S. 836, 845-46, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). There, the Court stated that "the Confrontation Clause reflects a **preference** for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case." **Id.** at 849, 110 S.Ct. at 3165 (citations and internal quotation marks omitted; emphasis in original). The Court continued:

> That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may easily be dispensed with. …[A] a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.

**Id.** at 850, 110 S.Ct. at 3166, 111 L.Ed.2d 666 (citations omitted). Finally, the court emphasized the importance of making an individualized, case-specific determination of whether the denial of physical, face-to-face confrontation is necessary to further an important public policy.[11] **Id.**

In the present case, the trial court stated:

> In the instant matter, the [c]ourt found important state interests excusing N.B.'s personal appearance in light of the COVID-19 pandemic. As discussed in this [c]ourt's [o]pinion, filed August 27, 2020, N.B. was permitted to testify at trial via two-way simultaneous audio-visual communication because she suffered from a particular

---

[11] The Court also provided that face-to-face confrontation shall only be dispensed with where the reliability of the testimony is otherwise assured. **Craig, supra** at 850, 110 S.Ct. at 3166.

> susceptibility to the COVID-19 virus. Further, this [c]ourt found that because N.B. would have to travel from a COVID-19 "hotspot" in Florida, in person attendance of N.B. would potentially expose those in the Courtroom to the COVID-19 virus, as well as those in the surrounding community.

(Trial Court Opinion, 3/19/21, at 4-5) (citation formatting altered).

Upon review, we agree that given the circumstances of this matter, considerations of public policy and the necessities of the case justify overcoming the preference for face-to-face confrontation. Because N.B. was particularly susceptible to COVID-19, traveling to trial would have posed a severe health risk. Further, great care was taken to preserve Appellant's right to confront the witness—the jury could view her demeanor and she was subject to cross-examination. *See Atkinson, supra* at 748. In addition, as the court noted, there was an important public policy interest in not exposing those in the courtroom to an increased risk of COVID-19, where N.B. resided in a COVID "hot spot." Therefore, we hold that based on the specific circumstances of this case, Appellant's right to confront N.B. was not violated when the court permitted her to testify via simultaneous two-way audio-visual communication. *See Craig, supra*; *Atkinson, supra*. Appellant's final issue does not merit relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/21/2022