J-S37006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| AMIR CRUZ | : | |
| | : | |
| Appellant | : | No. 2802 EDA 2024 |

Appeal from the Judgment of Sentence Entered October 4, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001726-2024

BEFORE:   DUBOW, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED NOVEMBER 19, 2025**

Appellant, Amir Cruz, appeals from the October 4, 2024 judgment of sentence of 2½ to five years of incarceration entered in the Philadelphia County Court of Common Pleas following his conviction of violations of the Uniform Firearms Act.  Appellant challenges the denial of his motion to suppress evidence.  After careful review, we affirm.

The relevant facts and procedural history are as follows.  On February 22, 2024, Philadelphia Police Officers Grace Oyana—a six-year veteran of the Philadelphia Police Department—and Jason Keen were on patrol in Philadelphia's 25th Police District.[1]  At around 10:30 PM, the officers drove past two men, one of whom police later identified as Appellant, walking westbound

---

[*] Former Justice specially assigned to the Superior Court.

[1] The 25th Police District is "an area known for gun violence."  Suppression Ct. Op., 2/11/25, at 2.

on the 500 block of E. Wyoming Street. After seeing the men, the officers, who were dressed in full uniform and travelling eastbound in their marked patrol vehicle, performed a U-turn, and pulled up beside Appellant and his companion. They did not activate the patrol vehicle's sirens or lights. The officers parked the vehicle in the travel lane of the street, with a row of parked cars separating the patrol vehicle from Appellant, who remained standing on the sidewalk.

While still inside the patrol vehicle, Officer Oyana asked Appellant if he had any weapons. Unsure as to whether Appellant had heard the question, Officer Oyana opened the patrol vehicle door, turned on his body-worn camera, and repeated the question. Appellant responded that he did not have any weapons, and lifted the left side of his jacket, exposing the left portion of his waistband. While lifting the left side of his jacket, Appellant held the right side of the jacket down with his right hand.

The officers, who had by then fully exited their patrol vehicle, which was not blocking Appellant's path of movement, walked toward Appellant. The officers did not demand that Appellant stop and neither officer drew a weapon. They again asked Appellant if he had any guns or weapons on him, and Appellant again lifted the left side of his jacket exposing the left side of his waistband and stated " I don't have a gun. I wouldn't lie to you, sir. I wouldn't lie to you, Officer." N.T., 5/30/24, at 13. Notably, Appellant did not lift the right side of his jacket and this time "bladed" his body away from Officer Oyana to shield his right side. Officer Oyana approached closer to

Appellant, shined his flashlight, and Appellant spontaneously asked Officer Oyana "do you wanna search?" *Id.* Appellant then voluntarily turned his body and walked toward a retaining wall, stopped, and put his hands on the retaining wall. Officer Oyana searched Appellant, first recovering a cell phone and then a gun tucked inside Appellant's right waistband. After placing handcuffs on Appellant, Officer Oyana asked Appellant if he had a permit to carry the gun, and Appellant indicated that he did not.

The Commonwealth subsequently charged Appellant with one count each of Possession of Firearm Prohibited, Firearms Not to be Carried Without a License, and Carrying Firearms in Public in Philadelphia.[2]

On March 27, 2024, Appellant filed a motion to suppress the firearm, claiming that the officers illegally stopped and searched him without reasonable suspicion and arrested him without probable cause.

On May 30, 2024, the suppression court held a hearing on Appellant's motion at which Officer Oyana testified in accordance with the above facts. In describing the area where this incident occurred, Officer Oyana explained that he had responded to calls to that area "multiple times" and that the police department has an "overnight officer stationed there because of ongoing just shootings that happen in the early hours, late night – in the super late-night hours, around like 10:00, and shootings that happen around like, 5:00 a.m. There's also like ongoing robberies, point-of-gun robberies, that happen

---

[2] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

around that area. So, we're told to kind of, as we patrol, make sure we frequent that area." *Id.* at 9-10. With respect to Officer Oyana's own experience with the specific block in question, he testified that "there have been a couple stores that have been robbed point of gun, a couple restaurants kind of back to back. We've been responded there for, I think, one recently. There was a shooting about a block away." *Id.* at 10. Officer Oyana testified that he has recovered firearms in the area.

Officer Oyana also explained "blading," testifying that, in his experience, people "do [the blading] motion when they don't want me to see a certain side of their body. . . . There's typically been something on that side that's illegal that they don't want me to know about." *Id.* at 17. The Commonwealth also played the video recorded by Officer Oyana's body-worn camera that showed Officer Oyana's interaction with Appellant. The recording was consistent with Officer Oyana's testimony and confirmed that his tone of voice during the interaction was calm.

On cross-examination, Officer Oyana testified that when he first saw Appellant, he did not notice any bulges in Appellant clothing or any L-shaped objects, and Appellant and his companion were not attempting to conceal themselves.

After considering the testimony presented and the argument of counsel, the suppression court denied Appellant's motion to suppress. The trial court found that the interaction between Appellant and the police officers began as a mere encounter and later became an investigative detention supported by

- 4 -

the officer's reasonable suspicion that Appellant was engaged in criminal activity.

Appellant proceeded to a stipulated bench trial, following which the court convicted Appellant of all charges. On October 4, 2024, the trial court sentenced Appellant to a term of 2½ to 5 years of incarceration for the Possession of Firearm Prohibited Conviction and 3 years of probation for the Firearms Not to be Carried Without a License conviction.[3]

This timely appeal followed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issue on appeal:

> Did not the lower court err in denying the motion to suppress physical evidence and statements made, including any coerced permission to search, pursuant to the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution where the officer seized the defendant without reasonable suspicion of criminal activity?

Appellant's Brief at 2.

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Evans*, 153 A.3d 323, 327 (Pa. Super. 2016) (citation omitted). "Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that

_____

[3] The court imposed no further penalty for the Carrying Firearms in Public in Philadelphia conviction.

the challenged evidence was not obtained in violation of the defendant's rights." **Commonwealth v. Wallace**, 42 A.3d 1040, 1047–48 (Pa. 2012). Our scope of review of the suppression court's factual findings is limited to the record from the suppression hearing. **Commonwealth v. Barr**, 266 A.3d 25, 39 (Pa. 2021). "Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." **Evans**, 153 A.3d at 327 (citation omitted). Furthermore, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." **Commonwealth v. Elmobdy**, 823 A.2d 180, 183 (Pa. Super. 2003) (internal citation omitted).

The Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. **In re D.M.**, 781 A.2d 1161, 1163 (Pa. 2001). "To secure the right of citizens to be free from [unreasonable searches and seizures], courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive." **Commonwealth v. Beasley**, 761 A.2d 621, 624 (Pa. Super. 2000). There are three defined categories of interaction between citizens and police officers: (1) mere encounter, (2) investigative detention, and (3) custodial detention. **See**

*Commonwealth v. Collins*, 950 A.2d 1041, 1046 (Pa. Super. 2008) (*en banc*).

A mere encounter between a police officer and a citizen does not need to be supported by any level of suspicion and "carr[ies] no official compulsion on the part of the citizen to stop or to respond." *Commonwealth v. Fuller*, 940 A.2d 476, 479 (Pa. Super. 2007) (citation omitted). There is no constitutional provision that prohibits police officers from approaching a citizen in public to make inquiries of them. *Beasley*, 761 A.2d at 624. A mere encounter may escalate into an investigatory detention or seizure if police action becomes too intrusive. *Id.* However, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa. Super. 2002) (*en banc*) (explaining that when an officer "merely questions the citizen without suggestion of coercion," the interaction is a "mere encounter").

"Both the United States and Pennsylvania Supreme Courts have held that the approach of a police officer followed by questioning does not constitute a seizure." *Commonwealth v. Coleman*, 19 A.3d 1111, 1116 (Pa. Super. 2011) (citations omitted); *see also Commonwealth v. DeHart*, 745 A.2d 633, 638 (Pa. Super. 2000) ("search and seizure law has never been so strictly construed as to prevent police officers from making a brief inquiry of people they come across on a street corner"); *Commonwealth v. Smith*, 836 A.2d 5, 11 (Pa. 2003) ("the mere approach of police followed by police

questioning, including requests to examine identification and requests for consent to search, generally does not amount to a seizure"). This is true even if the officer asks the individual whether he is carrying a weapon. **Coleman**, 19 A.3d at 1116 (holding that officer was engaged in a mere encounter when he approached the defendant and asked him if he had a gun).

An interaction only passes from a mere encounter to a seizure "when the officer, by means of physical force, or by displaying or asserting authority, restrains the liberty of the citizen…" **Commonwealth v. Boswell**, 721 A.2d 336, 340 (Pa. 1998) (*plurality*).

Our Supreme Court has recognized that the U.S. Supreme Court has held "that law enforcement officials may briefly detain an individual for questioning and pat down or 'frisk' the person based on facts that amount to less than probable cause to arrest." **Commonwealth v. Adams**, 205 A.3d 1195, 1203 (Pa. 2019) (citing **Terry v. Ohio**, 392 U.S. 1 (1968)). To conduct a constitutionally valid investigative detention, or **Terry** stop, police must have "reasonable suspicion that criminal activity was afoot." **Id.** at 1203.

Reasonable suspicion "is less than a preponderance of the evidence but more than a hunch." **Commonwealth v. Jackson**, 907 A.2d 540, 543 (Pa. Super. 2006) (citation omitted). "Reasonable suspicion must be based on specific and articulable facts, and it must be assessed based upon the totality of the circumstances . . . viewed through the eyes of a trained police officer[.]" **Commonwealth v. Williams**, 980 A.2d 667, 671 (Pa. Super. 2009) (citation omitted). In addition, "we must give due weight...to the specific reasonable

inferences the police officer is entitled to draw from the facts in light of his experience." *Commonwealth v. Rice*, 304 A.3d 1255, 1261 (Pa. Super. 2023) (citation omitted).

The presence of a concealed firearm alone is insufficient to establish reasonable suspicion; however, the surrounding circumstances, such as the suspect's conduct and presence in a high-crime area, combined with a firearm, may establish reasonable suspicion. *Commonwealth v. Hicks*, 208 A.3d 916, 938-39, 945 (Pa. 2019). Whether an officer possessed reasonable suspicion that a suspect was armed and dangerous is determined by examining the totality of the circumstances. *Id.* Although an individual's mere presence in a high-crime area alone does not authorize a frisk, "the fact that [a] stop occurred in a 'high crime area'" is a relevant factor to consider in a reasonable suspicion analysis. *In re D.M.*, 781 A.2d at 1163–64 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). *See also Commonwealth v. Lewis*, ___ A.3d ___, 2025 WL 2724795 at *1 (Pa. 2025) (reiterating that "a suppression court may properly consider [whether an area is high in crime] among the totality of the circumstances when assessing whether reasonable suspicion existed at the time of a stop" and explaining that it is within the suppression court's "discretion to determine whether the Commonwealth has proven an area is high in crime, as well as how much weight to assign this factor").

Appellant contends that the trial court erred in denying his motion to suppress. Appellant's Brief at 8-20. In particular, Appellant claims that the

investigating officers lacked reasonable suspicion to stop him because they had no reason to believe he was engaged in criminal activity or that he was armed and dangerous. *Id.* at 8-12. Appellant asserts, instead, that the officers targeted Appellant merely because of his location in a purportedly high crime area—a factual finding that Appellant claims the record does not support. *Id.* at 12-13. Appellant claims that the officers bypassed the "mere encounter" stage of an interaction between citizens and police when they did not ask Appellant for his name and identification. *Id.* at 11, 13-15. Appellant contends, therefore, that the interaction between him and the officers was, from the outset, an illegal investigative detention for which the officers lacked reasonable suspicion. *Id.* He also claims that by repeatedly asking him whether he possessed a firearm, despite his denials, the officers' conduct constituted an impermissible seizure. *Id.* at 15-17. Last, Appellant asserts that his possession of a firearm did not rise to the level of criminality necessary to justify his seizure by police. *Id.* at 18-20.

The trial court found that when the officers initially pulled their patrol vehicle up to Appellant and his companion and asked them whether they had any firearms that they had engaged in a "mere encounter." Trial Ct. Op. at 4. The court based this finding on Officer Oyana's testimony that the officers "remained inside their patrol car. They spoke in a normal tone and did not demand that Appellant stop. Moreover, their weapons were not drawn, and the lights and sirens of their vehicle were not activated." *Id.*

The court then found that the situation "ripened into reasonable suspicion to engage in a safety frisk/investigative detention." *Id.* As the court explained:

Appellant denied having a weapon and voluntarily lifted the left side of his jacket while holding down the right side. This conduct was suspicious and signified that Appellant was hiding a weapon. At this point, the officers exited their patrol car and walked toward Appellant. Appellant lifted the left side of his jacket once again, but this time bladed the right side of his body away from the officers to shield that portion of his body from view. This act was another indication that Appellant may have been hiding a weapon. Officer Oyana asked Appellant a second time whether he had a weapon. Before the officers could initiate a safety first, Appellant again denied having a weapon and told the officer[s] they could search him. Thus, he consented to a frisk.

In sum, the officers had reasonable suspicion to conduct an investigative detention and Appellant consented to a search, As a result, his suppression claim must fail.

*Id.* at 4-5.

With respect to Appellant's claim that the record does not support the suppression court's finding that the area in which the officers encountered Appellant was a "high crime" area and that the court erred in denying his suppression motion based on that finding, the court explained as follows:

Officer Oyana testified that the 25th Police District, and more specifically the 500 block of E. Wyoming Street, was known for violent gun crimes. According to the officer, there were recent and multiple gunpoint robberies and shootings in that [area].

*Id.* at 5. Nevertheless, the court noted that its "findings did not hinge on the description of the area but focused instead on Appellant's actions and

- 11 -

suspicious behavior on the night in question as well as his consent to a search." *Id.*

Following our review, we conclude that the record supports the trial court's factual findings and its legal conclusions are free of legal error. We agree with the trial court that the officers' interaction with Appellant began as a mere encounter. When the officers initially interacted with Appellant, they did so on a public street and from inside their patrol vehicle. The body camera recording confirmed that the officers had not activated their lights, sirens, or loudspeakers, and that Officer Oyana spoke to Appellant in a neutral tone and with a calm demeanor, and did not brandish his firearm. In light of these facts, Officer Oyana's inquiry as to whether Appellant had any firearms or other weapons in his possession did not constitute a seizure for which Officer Oyana required reasonable suspicion that criminal activity was afoot.

We further agree that the interaction then escalated into an investigative detention when Officer Oyana developed reasonable suspicion, based on the totality of the circumstances, that Appellant was concealing an illegal weapon. The suppression court credited Officer Oyana's testimony that he was suspicious that Appellant was concealing an illegal weapon because Appellant lifted only the left side of his jacket, while holding the right side down, and used a "blading" motion, which he explained, in his experience people "typically" use when "there's something on that side that's illegal that they don't want me to know about." N.T. at 17. In addition, Officer Oyana was familiar with the location in which he encountered Appellant and knew it

to experience a high level of crime, including gunpoint robberies and shootings.[4] In light of these facts, we conclude that Officer Oyana's investigative detention and search of Appellant was legal. Thus, the suppression court did not err in denying Appellant's motion to suppress.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/19/2025

_____

[4] It also bears noting that, during the course of the investigative detention, which, as we have explained, was supported by Officer Oyana's reasonable suspicion, Appellant offered Officer Oyana the opportunity to search him, voluntarily turned around, and spread his arms and legs onto a retaining wall, thereby facilitating Officer Oyana's search.